**Coy Wayne WESBROOK, Appellant,**

v.

**The STATE of Texas.**

No. 73205.

Court of Criminal Appeals of Texas, En Banc.

Sept. 20, 2000.

Wayne T. Hill, Houston, for appellant.

Keli Pool Roper, Asst. Dist. Atty., Houston, for the State.

## *O P I N I O N*

MANSFIELD, J., delivered an opinion announcing the judgment of the Court, in which KEASLER, J., joined.

Appellant, Coy Wayne Wesbrook, was charged by indictment for capital murder committed in Harris County on November

13, 1997. See Tex. Pen.Code § 19.03(a)(7). A verdict of guilty was returned by the jury. That same jury answered the special issues in such a manner that the trial court was obligated to impose a sentence of death. See Art. 37.071, § 2(b),(e) & (g).[1] Direct appeal to this Court is automatic pursuant to Article 37.071, § 2(h). Appellant presents thirteen points of error for consideration. With the exception of those points challenging the sufficiency of the evidence, each point of error will be addressed in the order it occurred at trial. We will affirm appellant's conviction and punishment.

Appellant, in points of error two and three, challenges the legal and factual sufficiency of the evidence presented during the guilt/innocence stage of trial. To properly consider these points, it is necessary to review the relevant facts, as illustrated by the State's evidence and by appellant's own testimony.

Around two o'clock in the morning, on November 13, 1997, 9–1–1 operators in Harris County received several calls reporting the sound of gunshots coming from a downstairs apartment in a small complex located in the eastern portion of the county. Five shots were heard within approximately forty seconds. Neighbors, either already awake or awakened by the gunshots, rushed outside to find one man lying on the ground and appellant, armed with a hunting rifle, exiting the apartment. Neighbors described appellant as calm as he walked to his truck, placed the gun inside the cab, and then stood by the tailgate where he waited for the sheriff's deputies to arrive. As appellant waited, he was overheard making comments like, "I did it. I did it. Let's get it over with," or "I did what I had to do." Appellant continued to make similar statements, some of which could be heard on various 9–1–1 calls made from the crime scene that night.

---

1. All references to Articles are to those in the Texas Code of Criminal Procedure in effect at the time of trial.

The first deputy on the scene found appellant waiting patiently and also observed a male figure, obviously deceased, lying on the ground nearby. Appellant peacefully complied with law enforcement demands as he was taken into custody. When law enforcement officers looked inside the apartment, they saw the bodies of a woman lying on a couch and a man in a kneeling position on the floor next to a second couch. A fourth victim, still alive, lay on the floor. When the deputy asked appellant who was inside, he replied, "My ex-wife, that's who I came here to get." [2] Stepping inside, the deputy found appellant's estranged wife, also still alive, in the bedroom. Appellant, who was handcuffed at this point, was questioned about the location of the gun. He indicated with his head and said, "It's in my truck." With appellant's consent, investigators searched the truck and recovered the weapon. A search of the grounds outside the apartment turned up a live round consistent with the bullet used in appellant's rifle. A firearms expert testified that appellant's gun was capable of holding five rounds, four in the magazine and one in the chamber.

The female victim on the couch, Ruth Money, was believed by investigators to have been shot first. She sustained a single wound to her chest from a bullet fired in a downward trajectory that exited her lower back. The second person shot was either the victim found outside, Anthony Rogers, or the victim found inside kneeling next to the couch, Antonio Cruz. Rogers was hit with a bullet that passed through his right arm, entered his chest, struck his right lung, and exited the body. Evidence indicated that he was shot either just before he attempted to exit the apartment door or as he was exiting. Cruz was killed by a bullet fired into his ear that severed his spinal cord and exited the back of his neck. The two remaining victims were believed to have been shot in the apartment bedroom from a distance of approximately two to four feet. The last male victim, Kelly Hazlip, was shot in the abdomen from a distance of about two feet. Hazlip survived for five days before dying. Appellant's estranged wife, who died shortly after emergency personnel arrived, appears to have held her hand up in a defensive gesture just before appellant fired. That hand suffered extensive damage as the bullet passed through. Bullet and bone fragments were then blown back into her face, neck and the right half of her chest and shoulder.

Appellant, the only surviving witness to the shooting, testified on his own behalf to explain the sequence of events that night. Appellant told the jury that he and his estranged wife, Gloria Coons, had separated, but he had arrived at her apartment after she had given indications of reconciliation. He had hoped she would be alone but, instead, he found Coons with her roommate, Ruth Money, and two male friends, Kelly Hazlip and Anthony Rogers. It was apparent that all had been drinking extensively. Appellant agreed to sit down and drink with the group even though he claimed he was uncomfortable with the situation. Antonio Cruz arrived a short time later.[3] Eventually, the subject of conversation in the group turned to that of a sexual nature and culminated with appellant's estranged wife walking into her bedroom with Hazlip. After a few moments,

---

**2.** There was some conflict over appellant's actual statement at this point. Defense counsel pointed out on cross-examination that during an earlier hearing the sheriff's deputy who testified about this statement indicated that appellant had replied, "My wife, that's who I came here to see."

**3.** A neighbor testified that sometime during the evening appellant's truck was heard driving off and then returned about thirty minutes later. Appellant testified that he and Rogers left together to get more beer. Prosecutors presented an alternative argument that appellant actually left alone in his truck to retrieve his rifle from home. Appellant denied this and claimed his rifle always remained in his truck.

Anthony Rogers joined them. A short time later she reappeared with Rogers, whose pants were unzipped, announced that she had just provided him with oral sex, and she was about to have sex with Hazlip who was still in the bedroom.

At this point, as appellant testified, he was humiliated by this behavior and left the apartment to get in his truck and leave. Antonio Cruz followed, briefly talked with appellant, and eventually grabbed the truck's keys as appellant tried to start the vehicle. Cruz kept the keys and reentered the apartment.[4] Appellant grabbed his hunting rifle and followed to get the keys back. Once inside, appellant claimed he was verbally harassed, threatened, and physically abused by those present. He testified that Ruth Money threw a beer at him, and he fired the gun at her in response. Rogers and Cruz, according to appellant, then rushed toward him, and he shot both men. Finally, appellant entered the bedroom, saw Coons and Hazlip still having sex and shot both. In his defense, appellant told the jury that he "lost it" and had no intention of killing any of the people inside that apartment.

In his second point of error, appellant argues the evidence used to establish his conviction for capital murder was legally insufficient because alternative evidence established that he was justified in using deadly force against Antonio Cruz. See Tex. Pen.Code § 9.42.

 ■ Evidence is legally insufficient if, when viewed in a light most favorable to the verdict, a rational jury could not have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Jones v. State*, 944 S.W.2d 642, 647 (1996), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also

the exclusive province of the jury to reconcile conflicts in the evidence. *Jones v. State*, 944 S.W.2d at 647. A claim of legal insufficiency is, in effect, an argument that the case should never have even been presented to the jury. *Clewis v. State*, 922 S.W.2d 126, 132 (Tex.Crim.App.1996).

 ■ By claiming legal insufficiency in this manner, appellant is arguing that the evidence of justification to kill Antonio Cruz in order to retrieve his personal property was so compelling that the issue of his guilt should have never even been presented to the jury for its consideration. We disagree. Although the trial court decided that enough evidence existed to warrant a jury instruction on justification to protect personal property, we can confidently state that, after thoroughly examining the available record and viewing it in a light favorable to the verdict, this evidence of justification was not so strong that it greatly preponderated against the jury's finding of capital murder to the point of completely overwhelming it and rendering that evidence legally insufficient. Moreover, the jury's implicit rejection of appellant's theory of justification could not be considered irrational given the quantum of incriminating evidence presented by the State. Appellant's second point of error is overruled.

In his third point of error, appellant argues the evidence was factually insufficient to "establish that [he] intentionally and knowingly caused the death of Gloria Coons and Antonio Cruz."

 ■ This Court possesses the authority to conduct a factual sufficiency review on direct appeals. *Jones v. State*, 944 S.W.2d at 647. To conduct this review, we discard the prism utilized in a legal sufficiency review and, instead, view all of the evidence in a neutral light favoring neither side. *Clewis v. State*, 922 S.W.2d at 129.

---

4. The truck's keys were finally recovered from the sister of Antonio Cruz. After her brother's autopsy, she was allowed to retrieve his be-

longings and found them in the pocket of his pants.

We will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Ibid.* A factual sufficiency review must be appropriately deferential so as to avoid the appellate court's substituting its own judgment for that of the fact finder. *Jones v. State,* 944 S.W.2d at 647. "The court's evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Id.* at 648.

▇ Whether he killed because of the rage he felt over his estranged wife's flagrant promiscuity or he killed because of the need to retrieve his property, the evidence indicates appellant made sure his weapon was loaded to its maximum capacity,[5] he walked into a small apartment with this high-powered rifle and, from close range, fired a single bullet into vulnerable regions of each of the five individuals who were inside. Afterwards, he stepped outside and proclaimed to the neighbors that he "did it." The only evidence that indicated this was an act of sudden passion was appellant's own testimony in which he stated that while he shot the victims, there was no intent to kill them. The jurors were free to place whatever value they wished upon appellant's testimony. They apparently rejected his proclamation and reasonably concluded that the evidence indicated appellant either acted with intent or acted knowingly. Viewing this evidence in a neutral light, we see no manifest injustice in this result and overrule the third point of error.

Appellant, in his fourth and fifth points of error, argues the trial court "erred in failing to declare the Texas Death Penalty statute unconstitutional" on the grounds it violated the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, appellant argues he was denied due process and equal protection and subjected to cruel and unusual punishment because he was prevented from submitting special instructions to the jury at both guilt/innocence and punishment on the issue of "sudden passion" arising out of "adequate cause." See Tex. Pen.Code § 19.02(a), (d).

▇ The Legislature is vested with the lawmaking power of the people in that it alone "may define crimes and prescribe penalties." *Matchett v. State,* 941 S.W.2d 922, 932 (Tex.Crim.App.1996), *cert. denied,* 521 U.S. 1107, 117 S.Ct. 2487, 138 L.Ed.2d 994 (1997); *State ex rel. Smith v. Blackwell,* 500 S.W.2d 97, 104 (Tex.Crim.App. 1973). It is within the Legislature's exclusive power to define the elements of capital murder and establish guidelines for deciding when the sentence of death is an appropriate penalty. *Matchett v. State,* 941 S.W.2d at 932; *Ex parte Granviel,* 561 S.W.2d 503, 515 (Tex.Crim.App.1978). *And while all persons or things within a particular class or similar situation must be affected alike,* the State possesses broad discretion in classification in the exercise of its power of regulation. *Taylor v. State,* 513 S.W.2d 549, 551 (Tex.Crim.App. 1974). The Legislature set out the guidelines and requirements to be met before an individual could stand trial and be convicted of either murder or capital murder, and appellant, in the instant case, satisfied the criteria for capital murder when he "murder[ed] more than one person during the same criminal transaction."[6] Tex. Pen.

---

5. Prosecutors argued that, as evidenced by the live round found on the ground outside the apartment, as appellant checked to ensure the rifle was loaded, he ejected a round from the rifle's chamber and then replaced the bullet with one of several he stored in his truck.

6. Appellant's argument rests on the proposition that the Legislature envisioned the killing of multiple people arising from "sudden pas-

sion" because this passion can arise "out of provocation by the individual killed or *another acting with the person killed ....*" Tex. Pen.Code § 19.02(a)(2) (emphasis supplied). Appellant places a great deal of faith in this emphasized phrase, faith that we feel is misguided. A commonsense reading of the definition of "sudden passion" describes the killing of only one person; provocation by the *individual* killed or another acting with the

Code § 19.03(a)(7)(A). At the time of appellant's trial, the issue of sudden passion was solely a punishment issue to be determined only after a conviction of murder.[7] The jury had been provided the option of convicting appellant of the lesser-included offense of murder but convicted him, instead, of the greater offense of capital murder. At this point, the issue of "sudden passion" could be considered only as a mitigating circumstance for the jury when deciding the second punishment issue. See Art. 37.071, § 2(d)(1). See also *Buhl v. State*, 960 S.W.2d 927 (Tex.App.—Waco, pet.ref'd), *cert. denied*, 525 U.S. 1057, 119 S.Ct. 623, 142 L.Ed.2d 561 (1998). The Legislature, through its broad power to classify crimes and those who stand accused of crimes, chose not to permit the defense of "sudden passion" in the context of capital murder. No equal protection concerns are present as a result of the Legislature's prerogative to treat capital murder defendants differently from other murder defendants in this manner. Additionally, we are confident appellant experienced nothing that affected the fundamental fairness of his trial in violation of any right to due process. Finally, appellant fails to explain how he was subjected to cruel and unusual punishment, and we can discern no indications ourselves that the refusal to instruct the jury on "sudden passion" constituted cruel and unusual punishment. The trial court properly denied appellant's requests at both guilt/innocence and punishment to instruct the jury on the issue of sudden passion. Points of error four and five are overruled.

Appellant, in his tenth point of error, claims the trial court erroneously denied his request for a jury instruction on the lesser-included offense of aggravated as-

sault. The only evidence supporting an aggravated assault instruction came from appellant himself when he took the stand and, under direct examination, admitted that he fired the rifle but denied he possessed any intent to kill the five victims.

■ To determine if a defendant is entitled to a lesser-included offense instruction, a two prong test applies: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged, and (2) some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser included offense. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex.Crim. App.1993). The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Arevalo v. State*, 943 S.W.2d 887, 889 (Tex. Crim.App.1997). In the instant case, the trial record shows appellant acted intentionally, or at the least, knowingly, when he walked into an apartment armed with a high-powered rifle. He fired a single shot at close range into the chest of the first victim, a highly vulnerable portion of the body. After witnessing the damage that resulted from his actions, appellant continued to fire the weapon, again at close range, into four more individuals, choosing as his target, either their head, chest, or abdomen. Physical evidence from the scene and the condition of the bodies suggest that one victim was shot as he attempted to escape from the apartment and another was shot while on his knees. The only contrary evidence that this was not an intentional or knowing act is appellant's own assertion that he did not intend to kill. Given the state of the entire record, this

*person* killed. The language in this definition is couched in singular terms. Appellant's contention that the Legislature intended that the defense of "sudden passion" include the murder of more than one person has no merit.

**7.** For those murders committed after August 31, 1994, a defendant could attempt to prove

the issue of sudden passion by a preponderance of the evidence only at the punishment stage of trial. Tex. Pen.Code § 19.02(d). The option of convicting a defendant of voluntary manslaughter was no longer available. See *Moore v. State*, 969 S.W.2d 4, 9 (Tex.Crim. App.1998).

was not evidence from which a jury could rationally conclude that appellant was guilty only of aggravated assault. See *Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim.App.1999) (not entitled to instruction on the lesser included offense of aggravated assault when evidence showed appellant, at least, guilty of homicide). Appellant's tenth point of error is overruled.

 Appellant, in his eleventh point of error, asserts that the trial court erred by failing to submit defense counsel's requested limiting instruction to the jury regarding extraneous offenses introduced at the guilt/innocence stage of trial. Appellant had been indicted and stood trial in the case at bar for only the deaths of Gloria Coons and Antonio Cruz, and just before the jury began deliberations at the guilt/innocence stage of trial, appellant requested a limiting instruction regarding the admission of evidence concerning the three other murders that occurred that night and their status as extraneous offenses. The following colloquy occurred:

> TRIAL COURT: ... Any other objections or requests?
> DEFENSE COUNSEL: Yes, Judge, if I may read into the record a request regarding extraneous offenses and a limiting instruction be given to the jury. We would ask that the Court charge the jury as follows. You are instructed that if there is any testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense, if any were committed, and even then, you may only consider the same in determining the intent of the defendant, if any, in connection with

the offense, if any, alleged against him in the indictment in this case and for no other purpose.

> In other words, judge, there has been testimony that there were killings of three other individuals not named in the indictment, and obviously that would be an extraneous offense or offenses. And we don't want the jury being able to use that for any purpose other than which the law allows, which is the limiting instruction we're requesting.
> TRIAL COURT: Are those the only three extraneouses?
> DEFENSE COUNSEL: I believe those are the only three.
> * * * *
> TRIAL COURT: All right. Mr. Rosenthal, your response?
> PROSECUTOR: I need to make a telephone call before I can respond to that, Your Honor.
> TRIAL COURT: My plan would be to overrule that, that request. If you—— if the State wants me to give that, if you want to join in that, I think they're allowed to consider the totality of the circumstances in deciding and looking at all of those factors and deciding his intent and so forth, so I don't think that's a proper charge. If the State feels it's more prudent to give it, I will give it. So, come back to me and let me know. But unless I hear from you otherwise, I'm going to overrule that request.

 Appellant claims harm in this point of error because "the jury was allowed unfettered discretion in their use of extraneous offenses to decide ... guilt in the killing of Gloria Coons and Antonio Cruz in contravention of the Eighth and Fourteenth Amendments." We cannot agree that a limiting instruction, even if properly requested,[8] would have been ap-

---

8. Even if a limiting instruction would have been appropriate, appellant, under the circumstances, would have waived any error. A party opposing evidence has the burden of objecting and requesting the limiting instruc-

tion at the introduction of the evidence. Tex. R.Crim. Evid. 105. See *Garcia v. State*, 887 S.W.2d 862, 878 (Tex.Crim.App.1994), *cert. denied*, 514 U.S. 1021, 115 S.Ct. 1368, 131 L.Ed.2d 223 (1995) (once evidence is received

propriate. Evidence of the three additional killings from that evening was same transaction contextual evidence and, as such, admissible without a limiting instruction. See *Camacho v. State*, 864 S.W.2d 524, 535 (Tex.Crim.App.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Such extraneous offenses are admissible to show the context in which the criminal act occurred. *Archer v. State*, 607 S.W.2d 539, 542 (Tex.Crim.App.1980), *cert. denied*, 452 U.S. 908, 101 S.Ct. 3037, 69 L.Ed.2d 410 (1981). This evidence is considered "res gestae," under the reasoning that events do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that it may realistically evaluate the evidence. *Ibid.* When this evidence of extraneous offenses is used to prove a main fact in the case, an instruction limiting the jury's consideration of this evidence is generally not required. *Porter v. State*, 709 S.W.2d 213, 215 (Tex.Crim.App.1986). The eleventh point of error is overruled.

■ Appellant, in his twelfth point of error, claims he was entitled to a mistrial after inappropriate comments were made by the prosecutor during his closing argument. The comment, provided below, referenced a statement that appellant provided to police shortly after his arrest but which was never admitted into evidence or shown to the jury:

> They know that the evidence is overwhelming. The defendant knows the evidence is overwhelming. His fingerprints is (sic) on the rifle, found in his truck, walking out of the residence with the rifle. He has to come up with some story, and he does, ladies and gentlemen. *Two different stories. One to Detective Fikaris and one to you.*

Defense counsel immediately lodged a successful objection and asked that the jury be instructed to disregard the comment. The judge complied but refused to grant defense counsel's subsequent request for a mistrial. Appellant argues reversal is appropriate because the State "made highly prejudicial remarks that were unsupported by the record and injected new and harmful facts into the case." While the prosecutor's comment was inappropriate, we cannot agree this harm warrants the remedy of reversal.

■ The approved general areas of argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Hathorn v. State*, 848 S.W.2d 101, 117 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). Even when an argument exceeds the permissible bounds of these approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex.Crim.App.1980). The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Cantu v. State*, 939 S.W.2d 627, 633 (Tex.Crim.App.), *cert. denied*, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997). In most instances, an instruction to disregard the remarks will cure the error. *Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex.Crim.App.), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994); *Cooks v. State*, 844 S.W.2d 697, 727 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993).

Clearly, it is improper to invite the jury to speculate on the existence of evidence not presented and such was the case here.

without a proper limiting instruction, it becomes part of the general evidence in the case and may be used as proof to the full extent of its rational persuasive power). Appellant's

objection and request for the limiting instruction occurred just prior to arguments before the jury and, therefore, was untimely.

However, the prosecutor's comment was quickly followed by an instruction to disregard from the trial court which we presume was complied with by the jury. See *Colburn v. State,* 966 S.W.2d 511, 520 (Tex. Crim.App.1998). Only offensive or flagrant error warrants reversal when there has been an instruction to disregard, and, in the case at bar, this comment was not so flagrant that the instruction to disregard was ineffective. See *Wilkerson v. State,* 881 S.W.2d at 327. The twelfth point of error is overruled.

■ In the sixth point of error, appellant argues the trial court erroneously denied his motion to suppress evidence that had been obtained in violation of his Sixth Amendment right to counsel. Immediately prior to the punishment stage of trial, counsel for appellant filed a motion to suppress certain evidence that would be used by the State to establish appellant's future dangerousness but was arguably obtained in violation of his Sixth Amendment right to counsel. This evidence allegedly established an attempt by appellant to solicit the murder of various individuals, including witnesses at appellant's own trial. A hearing was held on the matter, and the following facts were developed through the testimony of two witnesses: a jailhouse informant and an investigator with the Harris County Sheriff's office. This testimony and audiotaped recordings of appellant were then introduced at the punishment stage of trial.

The informant was Phillip Jones, an occupant of the Harris County Jail, who became acquainted with appellant in March of 1998, about three months prior to appellant's trial. During numerous conversations between the two, appellant expressed a desire to hire someone willing to kill his first wife[9] and her common law husband. Eventually, health problems arose for appellant forcing him to be removed from the general population of the jail and moved to the infirmary. Jones, hoping to exploit this information about appellant, then contacted law enforcement agents through the local Crime Stoppers program. He informed a detective from the Houston Police Department about appellant's hopes to arrange the murder of his first wife and her common-law husband, and offered his services to obtain more information from appellant on the solicitation matter. In return, the State agreed to provide a good word on Jones' behalf during the prosecution of his pending charges. At this point, appellant's trial was scheduled to begin with the presentation of evidence in the next couple of weeks. The district attorney's office and police investigators acted in concert to develop a plan that would place Jones back with appellant in order to elicit additional information. Jones was instructed to "arrange" a meeting between appellant and Gary Johnson, an undercover investigator who would pose as a hit man.[10] By the time this was plan was initiated, the trial was in its opening days. Jones was transferred to the section of the jail housing appellant and had instructions to "get into a conversation" with appellant and "try to introduce Johnson as a hit man." Jones did manage to engage in this conversation about the solicitation, and appellant, not only reiterated the desire to have his first wife and her husband killed, but added five other individuals to his list, four of whom were witnesses who had testified or were going to testify against him at the guilt/innocence stage of trial.[11] Appellant eventually provided Jones a list of names of those he wanted "taken out" and the type of car each person drove.

Jones managed to contact Johnson, the "hit-man," over the phone. Appellant got on the line and talked at length about his

---

9. Gloria Coons, one of the victims in this case, was appellant's second wife.

10. This "hit man," as Jones was told to explain to appellant, was someone who owed the informant a favor and would agree to carry out the arranged murders.

11. The fifth name on the list was a fellow inmate of appellant at the Harris County jail.

desire to have these individuals killed. The next day, however, appellant was placed in contact with Johnson again and called off the arrangement saying he was afraid their conversations were being tape recorded by jailers.[12] Harry Fikaris, a Harris County detective, testified that Phillip Jones, as an informant, was "working for [him] and the State of Texas in this matter," and the objective of this investigation was to obtain evidence for a solicitation of murder case. Fikaris also admitted, however, that "there [was] no question in [his] mind" that the information and evidence obtained would be used against appellant during the prosecution of this capital murder case.

At the conclusion of this hearing, the trial judge determined that no Sixth Amendment violation had taken place because no right to counsel had attached with regard to the solicitation offense, and evidence obtained from appellant on this matter was, therefore, admissible. The motion to suppress was denied.

Appellant argues on this appeal that "the activities of Jones and the officers violated [his] Sixth Amendment right to counsel." In response, the State contends that, while the right to counsel had attached to the capital murder offense, it had not attached with regard to the solicitation offense, and investigators were free to question appellant in this matter. Additionally, the State argues, if this Court were to agree with appellant, it would effectively "prevent police from ever questioning a suspect about a crime when that suspect is already in custody for another offense." For the reasons explained below, a violation of appellant's Sixth Amendment right to counsel regarding the capital murder offense did occur.

 The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assis-

tance of Counsel for his defence." U.S. Const., amend VI. This right to counsel was made applicable to state felony prosecutions by the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963); U.S. Const., amend XIV. Attachment of this right occurs at all critical stages of prosecution, including post-indictment interrogations. *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 1408, 89 L.Ed.2d 631 (1986); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *State v. Frye,* 897 S.W.2d 324, 327 (Tex.Crim.App.1995); *Holloway v. State,* 780 S.W.2d 787 (Tex. Crim.App.1989). This right to counsel is considered offense specific and cannot be invoked once for all future prosecution. *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). However, the accused is guaranteed, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State for matters concerning that specific offense. *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). The State is then obligated to not act in a manner that circumvents the protections accorded the accused by invoking his right. *Ibid.* The Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent. *Ibid.* The Sixth Amendment right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that may have been entirely proper at an earlier stage of their investigation. *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986). Thus, the surreptitious employment of a cellmate (see *United States v. Henry,* 447 U.S. 264,

---

**12.** The conversations appellant had with Johnson were, in fact, recorded, not by jailers, but by investigators and were introduced

as evidence during the punishment phase of trial and played for the jury.

100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)) to "deliberately elicit" information violates the defendant's Sixth Amendment right to counsel even though the same methods of investigation might have been permissible before arraignment or indictment. *Michigan v. Jackson,* 106 S.Ct. at 1409. On the other hand, the use of a cellmate as informant contains no Sixth Amendment implications if the informant relays information he/she passively obtained. *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364. However, if an informant acting on behalf of the government deliberately used his position to secure incriminating information from the defendant when counsel was not present, and the informant had "stimulated" conversations with the defendant, even without direct questioning, in order to elicit incriminating information, this amounts to an "indirect and surreptitious interrogation." *Id.* at 2629. See also *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 2186–88, 65 L.Ed.2d 115 (1980).

 By intentionally creating a situation likely to induce appellant to make incriminating statements without the assistance of counsel, the State violated appellant's Sixth Amendment right to counsel. Jones, as an informant, was not housed with appellant to act as a passive "listening post." He was sent in with instructions to exploit the existing relationship he had forged with appellant in order to "deliberately elicit" incriminating information regarding the solicitation of murder.[13] See *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 2187, 65 L.Ed.2d 115 (1980). This information was then to be used at appellant's capital murder trial to help satisfy the State's burden of establishing that appellant posed a continuing threat to society. Just as a psychiatrist, acting as a state agent, cannot elicit information that

would be used to help demonstrate future dangerousness without counsel being notified first (see *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981)), so too, a jail house informant, acting at the behest of the State, cannot elicit information to be used at any stage of trial concerning charges in which the Sixth Amendment right to counsel had already attached and counsel had not been notified.

 The State's arguments that it was conducting a separate investigation detached from the capital murder offense and law enforcement's efforts to investigate these new or additional crimes would be unfairly impinged have both been addressed in past cases. The motive of the government in obtaining this information from appellant is irrelevant.

To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah.*[14] On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumvent-

---

**13.** It is clear that investigators considered Jones an agent of the State. Jones, too, considered himself to be an agent for the State, and even the trial judge as she heard arguments on the matter referred to Jones as "an agent of law enforcement."

**14.** *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

ing the accused's right to the assistance of counsel.

*Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985). This balance protects society's interest in allowing police to investigate new or additional crimes, but recognizes that the State's investigative powers concerning the indicted offense are limited by the accused's Sixth Amendment right to counsel.

We see no obstacle to the State using this evidence of solicitation at a trial on those charges because the Sixth Amendment right to counsel had clearly not attached with regard to that offense. Additionally, in any future punishment proceedings concerning the capital murder offense, prosecutors are also free to utilize whatever relevant information the informant obtained before he became an agent for the State. However, that evidence obtained by Jones after the State procured his services and which Jones elicited in order to help demonstrate appellant's future dangerousness was inadmissible at his capital murder trial because it was obtained in violation of his Sixth Amendment right to counsel.

■■■■ Having determined an error of constitutional magnitude occurred, we now conduct the concomitant harmless error analysis to determine if reversal of appellant's punishment is appropriate. Tex. R.App. Pro. 44.2(a).[15] See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967) (the critical inquiry is whether the error may have contributed to appellant's conviction or punishment). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988). We must be able

to conclude from the record that the erroneously admitted evidence was, in fact, harmless as to punishment beyond a reasonable doubt. *Ex Parte Russell,* 738 S.W.2d 644, 646 (Tex.Crim.App.1986). An appellate court should not focus on the propriety of the outcome of the trial. *Garcia v. State,* 919 S.W.2d 370, 380 (Tex. Crim.App.1994). Instead, the appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence. *Miles v. State,* 918 S.W.2d 511, 517 (Tex.Crim.App.1996) (plurality opinion); *Harris v. State,* 790 S.W.2d 568, 586–87 (Tex.Crim.App.1989). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Moreno v. State,* 858 S.W.2d 453, 466 (Tex.Crim.App.1993), *cert. denied,* 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1994). If an appellate court rules that an error is harmless, it is in essence asserting that the nature of the error is such that it could not have affected the jury. *Miles v. State,* 918 S.W.2d at 517; *Harris v. State,* 790 S.W.2d at 586–87. Stated in an interrogatory context, a reviewing court asks if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question. *Jones v. State,* 833 S.W.2d 118, 127 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993).

■■■ To support a finding of future dangerousness in the case at bar, prosecutors relied on the facts of the crime itself, the unadjudicated extraneous solicitation offense, and several bad acts committed by appellant.[16] Aside from evidence of a hor-

---

**15.** Tex.R.App. Pro. 44.2(a) reads:

"If the appellate record in a criminal case reveals constitutional error that is subject to a harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines

beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

**16.** These extraneous bad acts, for the most part, amounted to threats of violence that were made by appellant to a variety of indi-

rific killing spree that left five people dead, jurors heard from Phillip Jones, who, before he became an agent for law enforcement, independently discovered appellant's efforts to solicit the murders of two individuals. Jones' testimony about these particular facts was free from any Sixth Amendment concerns. The jury, at that point, validly possessed a critical indicator of future dangerousness: that appellant, despite his incarceration for a brutal multiple homicide, was willing to arrange and condone further murders, this time by proxy. Any additional, inadmissible testimony of appellant's hopes to expand his list of desired targets was of minimal consequence. In other words, because the jury possessed details of both the crime itself and the solicitation to murder, there is no reasonable likelihood that the inadmissible portion of Jones' testimony, considered either alone or in context, moved the jury from a state of nonpersuasion to persuasion regarding the issue of future dangerousness. See, e.g., *Lagrone v. State*, 942 S.W.2d 602, 620 (Tex.Crim.App. 1997), *cert. denied*, 522 U.S. 917, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997). The error that occurred was harmless beyond a reasonable doubt. We overrule appellant's sixth point of error.

■ In a related matter, appellant claims in his first point of error that the judge appointed to decide a motion to recuse the trial judge from this case abused his discretion in denying the claim. Counsel for appellant filed a motion to disqualify the Honorable Jan Krocker from the case on the grounds she participated in two *ex parte* meetings with pros-

ecutors three days before the start of testimony concerning the ongoing solicitation investigations involving appellant. These meetings were memorialized by the court reporter, they were offered as evidence during the recusal hearing, and made available for appellate review. During these *ex parte* discussions the prosecutors informed Judge Krocker of their investigative efforts.[17] Appellant contends that engaging in these *ex parte* communications was a violation of the Code of Judicial Conduct,[18] and by exposing herself to this potentially incriminating information, the impartiality of Judge Krocker was compromised. Specifically, appellant argues Judge Krocker should have been recused (or disqualified) because she was to rule on the admissibility of the very evidence she permitted the State to generate. The result, appellant claims, is a violation of his Fourteenth Amendment right to due process.

After appellant filed his motion to disqualify, and pursuant to Texas Rule of Civil Procedure 18a, another judge was assigned to rule on the motion. A hearing was held on the matter in which Judge Krocker was called to testify. Also, the record from those two *ex parte* meetings was introduced in evidence. Based on this information, the appointed judge denied appellant's motion to disqualify.

■ The refusal of a defendant's motion to disqualify is reviewable only for abuse of discretion. Tex.R. Civ. Pro. 18a(f). See *Kemp v. State*, 846 S.W.2d 289, 306 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). An appellate court should not

viduals over a number of years. During at least one of these threats appellant brandished a gun.

17. During these meetings, Judge Krocker was always cognizant of the need to inform defense counsel of these events as soon as was realistically possible without jeopardizing the ongoing investigation.

18. Tex. Gov't Code T.2, Subt. G, App. B, Jud. Conduct, Canon 3(B)(8):

A judge shall accord to every person who has legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party [or] an attorney ... concerning the merits of a pending or impending judicial proceeding....

reverse a trial judge whose ruling on the motion was within the zone of reasonable disagreement. *Ibid.* Additionally, "mere violations of the Code of Judicial Conduct alone, do not constitute reversible error ..., and ... [u]nethical conduct ... is not necessarily a legal ground for reversal." *Kemp v. State,* 846 S.W.2d at 305. Even assuming *arguendo* that a violation of the Code of Judicial Conduct did occur, and also assuming *arguendo* that it is possible such a violation has the potential to rise to the level of reversible error, appellant has failed in this case to demonstrate sufficient harm resulting from this alleged violation to the degree a reversal would be warranted. It is true that while sufficient bias can result in disqualification, it does so only in those cases in which the bias is shown to be of such a nature and to such an extent as to deny a defendant due process of law. *McClenan v. State,* 661 S.W.2d 108, 109 (Tex.Crim.App.1983). The State argued at the hearing on this matter that no showing was made by appellant that indicated Judge Krocker was influenced or biased in any way as a result of these two *ex parte* communications. The judge appointed to hear this disqualification motion agreed, and so do we. The defendant failed to demonstrate at the hearing, as was his burden, that Judge Krocker possessed any bias, much less sufficient bias that would have interfered with appellant's rights to due process. It is within the zone of reasonable disagreement that the presumption of judicial impartiality was not overcome by appellant. The assigned judge did not abuse his discretion in denying appellant's motion to disqualify Judge Krocker. Tex.R. Civ. Proc. 18a(f). See *Kemp v. State,* 846 S.W.2d at 306. Appellant's first point of error is overruled.

■ In the seventh point of error, appellant argues the trial court erroneously denied a requested jury instruction in the court's charge at punishment. Specifical-

ly, appellant claims he was entitled to a jury instruction pursuant to Article 38.23 because, in reference to the testimony of the informant, Phillip Jones, "the evidence raise[d] an issue about the legality of evidence obtained by the State." Regardless, a trial court is required to include an Article 38.23 instruction in the jury charge only if there is a factual dispute as to how the evidence was obtained. *Thomas v. State,* 723 S.W.2d 696, 707 (Tex.Crim.App. 1986). In the instant case, there was no dispute as to the facts surrounding the acquisition of Jones' testimony. The only determination to be made in this case was of a legal nature, not factual. See *Bell v. State,* 938 S.W.2d 35, 48 (Tex.Crim.App. 1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997). Appellant was not entitled to the requested jury instruction. We overrule the seventh point of error.

Appellant, in his eighth and ninth points of error, claims the trial court erred in denying him the opportunity to examine potential jurors on the issue of parole and also erred by denying a requested jury instruction on parole eligibility in the court's charge at punishment. We have addressed and overruled each point of error in past cases and there is no need to revisit these issues. See *Shannon v. State,* 942 S.W.2d 591, 596 (Tex.Crim.App. 1996); *Green v. State,* 934 S.W.2d 92, 105–06 (Tex.Crim.App.1996), *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997); *Felder v. State,* 758 S.W.2d 760, 761 (Tex.Crim.App.1988), *cert. denied,* 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993). Points of error eight and nine are overruled.

■ In appellant's thirteenth and final point of error, he contends the trial court erroneously failed to submit his requested instruction on renunciation into the jury charge at the punishment stage of trial. See Tex. Pen.Code § 15.04.[19] The pro-

---

19. Section 15.04 reads in relevant part:
(b) it is an affirmative defense to prosecution under Section 15.02 or 15.03 [criminal solicitation] that under circumstances manifesting a voluntary and complete renunciation of his criminal objective the actor

posed renunciation instruction, it is argued, was necessary after appellant called off his agreement with Gary Johnson, the undercover "hit man," because he was afraid his phone conversations were being recorded by jail personnel. In response, the State contends Section 15.04(b) is inapplicable because the affirmative defense instruction would only apply to a prosecuted offense under Section 15.02 or Section 15.03. We agree with the State's argument, but there is yet another reason why appellant's proposed instruction would have been inappropriate. Appellant called off his agreement with Johnson only because he was afraid their phone conversations were susceptible to electronic eavesdropping. Appellant did not renounce his intent to solicit the murders, and he did not take "affirmative action" to prevent the commission of the object offense. See *Hackbarth v. State*, 617 S.W.2d 944, 946 (Tex.Crim.App.1981). There was no evidence that would have supported an instruction on renunciation. The trial court did not abuse its discretion in refusing its submission. Point of error thirteen is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

MEYERS, J., delivered an opinion that concurred as to point of error two and otherwise joined the opinion of MANSFIELD, J.

KELLER, J., delivered an opinion that concurred in the result as to point of error six.

McCORMICK, P.J., joined the opinion of KELLER, J.

WOMACK, J., dissented with an opinion, in which PRICE, HOLLAND, & JOHNSON, JJ., joined.

countermanded his solicitation or withdrew from the conspiracy before commission of the object offense and took further affirmative action that prevented the commission of the object offense.

MEYERS, J., delivered this concurring opinion.

I write to expand upon the majority's discussion of appellant's second point of error. In his second point of error appellant claims the evidence is legally insufficient to support his conviction because, he argues, he acted in defense of his property. *See* Tex. Penal Code § 9.41.

When a defense is raised by the evidence, the State bears the burden of persuasion in disproving it beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 913 (Tex.Crim.App.1991). This doesn't mean the State is required to produce evidence contraverting the defensive evidence:

> Arguably, § 2.03(d)[1] appears to impose a burden on the State to directly refute a defense raised at trial, and dicta in [certain case law] certainly support[s] such a proposition, but the Practice Commentary to § 2.03(d) and other case law indicate otherwise. First, the Practice Commentary points out that the State has the burden of *persuasion* in disproving the evidence of [a defense]. That is not a burden of *production*, i.e., one which requires the State to affirmatively produce evidence refuting the [defensive] claim, but rather a burden requiring the State to prove its case beyond a reasonable doubt. Secondly, and more importantly, case law instructs us that [a defense] is an issue of fact to be determined by the jury. Defensive evidence which is merely consistent with physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. A

1. Penal Code § 2.03(d) provides: "If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted."

jury's verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.

... In resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's [defensive evidence], but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the [defensive] issue beyond a reasonable doubt.

*Id.* at 913–24 (citations omitted)(emphasis in original)(discussing self-defense).

The defensive evidence was presented in the form of appellant's testimony. Appellant testified that one of the victims, Antonio Cruz, took the keys to appellant's truck and refused to return them. Appellant also testified that when he entered the residence to retrieve the keys from Cruz, the five people he encountered there threatened him. Appellant argues the evidence is insufficient to establish his guilt because there were no eye witnesses and appellant's testimony was uncontraverted.

The State need not refute appellant's testimony. *Saxton, supra.* Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the evidence sufficient to support appellant's conviction. It would not be irrational for a jury to disbelieve appellant's testimony and rely on the evidence supporting guilt. The evidence showed that appellant shot the five individuals inside the residence, within a few seconds. Cruz was shot in the head, and the bullet followed a downward trajectory, which suggests he was shot while in a sitting or kneeling position. Although appellant claimed he was attempting to retrieve his keys from Cruz, the evidence reflected that another victim was shot first. After leaving the residence with his rifle, appellant calmly awaited the arrival of the police. He was overheard stating, "I did it.... I did what I had to do." This evidence is sufficient for a rational jury to find each element of the offense beyond a reasonable doubt.

With these comments, I concur in point of error two and otherwise join the opinion.

KELLER, J., delivered a concurring opinion in which McCORMICK, P.J., joined.

This case poses the following question: When, after indictment, an undercover government agent deliberately elicits a statement about an extraneous crime from the defendant, does the Sixth Amendment bar admission of the statement at the punishment phase of the trial on the charged offense? Unless the government agent's conduct constitutes entrapment, I would answer that question "no."

The Sixth Amendment right to counsel is violated when an undercover government agent deliberately elicits from a defendant incriminating evidence of an offense for which the defendant has already been charged.[1] "The Sixth Amendment right, however, is offense specific" and does not apply to crimes for which adversary criminal proceedings have not been initiated.[2] The Supreme Court's decision in *Maine v. Moulton* addressed the application of the Sixth Amendment to undercover investigations relating to multiple crimes, some that had been charged and some that had not. In *Moulton*, defendants Moulton and Colson were charged with four counts of theft.[3] Moulton and Colson had several meetings to discuss

---

1. *Maine v. Moulton*, 474 U.S. 159, 171–174, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *see also Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

2. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

3. *Moulton*, 474 U.S. at 162, 106 S.Ct. 477.

their upcoming trial.[4] At one of these meetings, Moulton suggested the possibility of killing one of the State's witnesses.[5] Later, Colson secretly agreed to cooperate with the police in exchange for the government's promise to refrain from bringing any additional charges against him.[6] Colson agreed to the secret recording of subsequent conversations between him and Moulton.[7] At a strategy meeting between the two, Moulton and Colson discussed fabricating an alibi for the charged offenses.[8] The two discussed the details of the thefts in order to develop an alibi that was believable.[9] Claiming memory lapses about the incident, Colson prompted Moulton for additional details of the thefts.[10]

The government argued that the recorded statements were admissible because the government was investigating an uncharged crime—Moulton's threat to kill one of the government's witnesses.[11] In rejecting the government's contention, the Court distinguished between evidence pertaining to the charged offense and evidence pertaining to other charges:

> To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah.* On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because oth-

er charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.[12]

* * *

> Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.[13]

The above passage articulates two propositions of law concerning the gathering of information by an undercover informant after the defendant has been indicted for an offense: First, the government may not use evidence pertaining to the charged offense at the trial of the charged offense even though the evidence may have been obtained incidentally during the government's investigation of an extraneous offense.[14] Second, the government may use evidence pertaining to an extraneous (uncharged) offense at the trial of that offense.[15] What *Moulton* did not decide is whether (or to what extent) the government may use evidence pertaining to an extraneous offense at the trial of the charged offense. That is the issue in this case.

---

4. *Id.*

5. *Id.*

6. *Id.* at 162–163, 106 S.Ct. 477.

7. *Id.* at 163–164, 106 S.Ct. 477.

8. *Id.* at 165–166, 106 S.Ct. 477.

9. *Id.*

10. *Id.*

11. *Id.* at 178, 106 S.Ct. 477

12. *Id.* at 180, 106 S.Ct. 477.

13. *Id.* at 180 n. 16, 106 S.Ct. 477.

14. *See also United States v. Terzado–Madruga,* 897 F.2d 1099, 1110 (11th Cir.1990).

15. *See also McNeil,* 501 U.S. at 176, 111 S.Ct. 2204.

Three factors distinguish this case from *Moulton*. The first factor is the most significant: the evidence presented in this case pertains to an extraneous offense. This factor renders the holding in *Moulton* inapplicable to the present case and eliminates the Supreme Court's concern about fabricated investigations. *Moulton* addressed a situation in which evidence of the charged offense was elicited during an investigation that supposedly centered on an extraneous offense. The Supreme Court was apparently concerned that law enforcement officials might fabricate the existence of an extraneous offense as an excuse to elicit evidence of the charged offense. However, where the evidence elicited pertains to an extraneous offense, a fabricated investigation seems unlikely, if it is even possible. Because the Sixth Amendment had not attached to the extraneous offense in the present case, the State was entitled to investigate and obtain this evidence from the defendant in the absence of counsel.[16]

The second factor distinguishing this case from *Moulton* is this: The statements made by Moulton related the details of a past crime.[17] The statements made by appellant, however, constituted a present crime (solicitation of murder) or a proposed future crime (murder, to be carried out in the future). This works strongly against finding a Sixth Amendment violation. Federal cases in the Seventh and Eleventh Circuits have held that the Sixth Amendment does not bar admission, at the trial for the charged offense, of statements that constitute a present crime or address a crime to be committed in the future.[18] Statements that constitute a present crime or propose a future crime are uniquely outside the attorney-client relationship because there is no right to the assistance of counsel in committing a new crime.[19] These types of statements are not covered by the attorney-client privilege, and the ethical rules do not require attorneys to keep such information confidential.[20] If a defendant made such statements in counsel's presence, counsel might be obligated to reveal those statements.[21] If counsel had been present during the exchange between appellant and the undercover informant, any advice to the defendant to refrain from making the statements would be "not because the statements would have shown a consciousness of guilt of complici-

---

**16.** If a Sixth Amendment violation can occur only at the time the evidence is obtained, that would seem to end the matter in this case. The State was entitled to elicit the extraneous offense evidence through the undercover informant, so there was no Sixth Amendment violation at inception, and no Sixth Amendment basis for excluding the evidence at *any* trial—even for the charged offense. However, there is at least some support for the idea that the Sixth Amendment can be violated by the admission *at trial* of uncounseled pretrial statements. *See Michigan v. Harvey*, 494 U.S. 344, 362 n. 7, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)(Stevens, J. dissenting); *United States v. Bender*, 221 F.3d 265, 270 n. 4, 2000 U.S.App. LEXIS 18722, *12–13, *13 n. 5 (1 st Cir.2000).

**17.** When Moulton raised the possibility of killing a government witness, he may well have been proposing a future crime, but that evidence was obtained before Colson became a government agent and was not the focus of the opinion in *Moulton*.

**18.** *United States v. Moschiano*, 695 F.2d 236, 240–243 (7 th Cir.1982), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983); *United States v. Darwin*, 757 F.2d 1193 (11 th Cir.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986). A similar holding occurred in *Grieco v. Meachum*, 533 F.2d 713, 717–718 (1 st Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976), but the First Circuit subsequently held that *Grieco* had been overruled by *Moulton*. *Bender*, 221 F.3d at 270, n. 4.

**19.** *Moschiano*, 695 F.2d at 241; *Darwin*, 757 F.2d at 1200.

**20.** *Grieco*, 533 F.2d at 718 n. 4 ("The privilege generally does not extend to confidences concerning present and future criminal activity"); *see also* Tex.R. Evid. 503(d)(1); Tex. Disc. R. Prof. Conduct 1.05(c)(7) & (8).

**21.** *Darwin*, 757 F.2d at 1200; *see also* Tex. Disc. R. Prof. Conduct 1.05(e); *Henderson v. State*, 962 S.W.2d 544, 554–556 (Tex.Crim. App.1997).

ty in ... murder, but because his statements, themselves, were the operative acts of a separate criminal offense." [22] As the Eleventh Circuit has noted, "*Massiah* is not a magic cloak with respect to future conduct." [23]

In addition, some of the people appellant wanted to kill were anticipated witnesses at the trial on the original charge. When the new criminal activity involves an attempt to subvert a defendant's upcoming trial, a form of estoppel arises with regard to any Sixth Amendment claim the defendant might otherwise have: the defendant cannot claim to be wronged by the admission of such evidence at the very proceeding the defendant has tried to improperly influence. [24]

Though these federal cases were decided before *Moulton*, their reasoning is still persuasive. The Seventh Circuit has distinguished a prior United States Supreme Court case on the ground that the prior case did not address the distinction between past wrongdoing and new criminal activity. [25] The Eleventh Circuit, in *Darwin*, did not make such a careful distinction between past and new crimes. In *Darwin*, most of the evidence obtained by the confidential informant related to a threat to kill a government witness, but there was some evidence relating to the original offense that was elicited and ad-

mitted at trial. [26] The Eleventh Circuit held that all of the evidence was admissible, so long as the government's investigation was not conducted in bad faith. [27] A later Eleventh Circuit opinion observed that this holding was superceded by *Moulton*. [28] But, as noted above, *Darwin* also stood for the proposition that a defendant has no right to counsel for statements relating to new criminal activity, [29] and to that extent, *Darwin* remains persuasive.

The third difference between this case and *Moulton* is that the disputed evidence in *Moulton* was presented during the guilt phase of trial, while the evidence here was presented during the punishment phase. Recently the First Circuit, while holding such evidence to be inadmissible at the guilt stage of trial, indicated that it would be admissible at sentencing. [30] And in *United States v. Kidd*, the Fourth Circuit held that the Sixth Amendment was not violated by the introduction of an extraneous offense (elicited by an undercover agent after indictment in the primary case) at the sentencing phase of trial for the charged offense. [31] In *Kidd*, the defendant was charged with several offenses regarding the possession and distribution of cocaine. [32] Later, an undercover informant made a tape-recorded purchase of cocaine from the defendant. [33] The defendant pled guilty to one of the earlier distribution

22. *Grieco*, 533 F.2d at 718 (ellipsis inserted).

23. *Darwin*, 757 F.2d at 1199 (quoting *United States v. DeWolf*, 696 F.2d 1, 3 (1 st Cir.1982)).

24. *Id.* (noting the irony that attempts by a defendant to improperly influence a proceeding may then become admissible in that proceeding; if so, "that is the defendant's lookout").

25. *Moschiano*, 695 F.2d at 242 n. 8 & 243 (distinguishing *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) on the ground that the case "did not address the issue whether post-indictment statements relating to new criminal activity could be used to prove the charges in the pending indictment").

26. 757 F.2d at 1196–1197.

27. *Id.* at 1199–1200.

28. *See Terzado–Madruga*, 897 F.2d at 1110.

29. 757 F.2d at 1200 ("the right to the presence of counsel simply does not extend to a situation in which the defendant is engaged in the commission of a separate offense").

30. *Bender*, 221 F.3d at 270, 2000 U.S.App. LEXIS 18722, * 14.

31. *United States v. Kidd*, 12 F.3d 30, 32–34 (4 th Cir.1993), *cert. denied*, 511 U.S. 1059, 114 S.Ct. 1629, 128 L.Ed.2d 352 (1994).

32. *Id.* at 31.

33. *Id.* at 32.

offenses, and at sentencing, the post-indictment sale was introduced as relevant conduct to enhance the defendant's punishment under the Federal Sentencing Guidelines.[34] Although the court expressed doubt about the propriety of introducing this evidence at the guilt stage of trial,[35] it held that the Sixth Amendment did not prohibit the introduction of the evidence at sentencing.[36] In arriving at this holding, the Fourth Circuit remarked, "The Sixth Amendment does not create a sanctuary for the commission of additional crimes during the pendency of an indictment."[37]

For these reasons, I would hold that the trial court did not err in admitting appellant's statements.

WOMACK, J., filed a dissenting opinion joined by PRICE, HOLLAND, and JOHNSON, JJ.

In *Satterwhite v. Texas*, 486 U.S. 249, 258–59, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the Court held that the admission, at the punishment stage of a capital trial, of evidence obtained in violation of a defendant's Sixth Amendment right to counsel may be harmless error if a court finds:

> that the erroneous admission of [the tainted] testimony was harmless beyond a reasonable doubt. A Texas court can sentence a defendant to death only if the prosecution convinces the jury, beyond a reasonable doubt, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The Court of Criminal Appeals thought that the admission of [the tainted] testimony on this critical issue was harmless because "the properly admitted evidence

was such that the minds of an average jury would have found the State's case (on future dangerousness) sufficient . . . even if [the] testimony had not been admitted." The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman* [*v. California*], 386 U.S. [18], at 24[, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)].[1]

Satterwhite murdered a woman during a robbery. The error in his trial was the admission of the testimony of a psychiatrist who had violated Satterwhite's right to counsel by examining him in jail. Using that information, the psychiatrist testified that, in his opinion, Satterwhite presented a continuing threat to society through acts of criminal violence.[2] The Court evaluated the error in the context of the record.

> The evidence introduced at sentencing showed that, in addition to his conviction in this case, Satterwhite had four prior convictions of crimes ranging from aggravated assault to armed robbery. Eight police officers testified that Satterwhite's reputation for being a peaceful and law-abiding citizen was bad and Satterwhite's mother's former husband testified that Satterwhite once shot him during an argument. The State also introduced the testimony of Bexar County psychologist Betty Lou Schroeder. Dr. Schroeder testified that she found Satterwhite to be a "cunning individual" and a "user of people," with an inability to feel empathy or guilt. She testified

---

**34.** *Id.*

**35.** *Id.* at 33 n. 2.

**36.** *Id.* at 33. *But see Jackson v. State,* 643 A.2d 1360, 1374 (Del.1994), *cert. denied,* 513 U.S. 1136, 115 S.Ct. 956, 130 L.Ed.2d 898 (1995)(disagreeing with *Kidd*'s holding that

extraneous offenses, so obtained, are admissible at sentencing).

**37.** *Id.*

**1.** Other citations omitted.

**2.** *Satterwhite,* 486 U.S. at 253, 108 S.Ct. 1792.

that in her opinion, Satterwhite would be a continuing threat to society through acts of criminal violence.[3]

The Court noted that the psychiatrist was the State's final witness, that his illegally-obtained testimony stood out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message, and that the prosecutor highlighted those points in his closing argument:

"Doctor James Grigson, Dallas psychiatrist and medical doctor. And he tells you that on a range from 1 to 10 he's ten plus. Severe sociopath. Extremely dangerous. A continuing threat to our society. Can it be cured? Well, it's not a disease. It's not an illness. That's his personality. That's John T. Satterwhite." [4]

Having reviewed the evidence in the case, the Court found it impossible to say beyond a reasonable doubt that the testimony did not influence the sentencing jury.[5]

Our review of the error in the case now before us should be modeled on that in the *Satterwhite* opinion. The appellant murdered his estranged wife, her roommate, and three men, some of whom he thought she was having sexual relations with. At the punishment stage there was testimony from a jail inmate that the appellant wanted to have his ex-wife and her husband killed. There was evidence of "threats of violence that were made by appellant to a variety of individuals over a number of years." [6] And the State introduced illegally-obtained evidence, which included tape-recorded conversations, that the appellant had solicited an undercover investigator to kill four witnesses in the trial, as well as a jail inmate. The illegal evidence was important. First it corroborated the admissible testimony of the inmate, who otherwise could have been easily disbelieved. As the State said in closing argument, "That individual, Philip Jones, you may also discount him if you wish. If you don't

want to believe anything he says, that's fine. Because the tapes are there." Second, the evidence about soliciting the murder of witnesses was of a different quality from all the other evidence in the trial, which was the appellant's crimes and misconduct that were committed in anger against acquaintances. The recordings allowed the State to say in final argument to the jury, "The man is a stone cold killer."

The illegally-obtained evidence figured prominently in the arguments to the jury. The State told the jury in opening argument that the "evidence, especially that tape, [was] very damning towards the defendant," and urged them to listen to the tape recordings "over and over and over." After reviewing the facts of the capital murder, the prosecutor reminded the jury that during the trial the appellant was "plotting the killings of five more people. It's unbelievable. But it's true. It's true, because you can hear it on tape. And tapes don't lie." The defense attorneys' arguments occupy 44 pages in the record, 13 of which were in response to the illegal evidence. In closing argument, the State again told the jury to listen to the tapes. The argument quoted the tapes, and used them to characterize the appellant as a "stone cold killer."

I find it impossible to say beyond a reasonable doubt that the testimony did not influence the sentencing jury. I respectfully dissent from the judgment to affirm the sentence of death.

---

3. *Id.* at 259, 108 S.Ct. 1792 (footnote omitted).

4. *Id.* at 259–60, 108 S.Ct. 1792.

5. *Id.* at 260, 108 S.Ct. 1792.

6. *Ante* at 125 n. 16.