Dearl HARDY, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–04–00595–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 9, 2006.

James Francis Keegan, Houston, for appellant.

Michael Adrian Mark, Liberty, for State.

Panel consists of Chief Justice HEDGES and Justices YATES and ANDERSON.

## MAJORITY OPINION

ADELE HEDGES, Chief Justice.

A jury found appellant Dearl Hardy guilty of perjury and a judge sentenced him to six months' confinement in the Chambers County jail and a $2,500 fine. In eight sub-points of error, appellant alleges that the evidence is both legally and factually insufficient to support his conviction. Because we find the evidence to be legally insufficient to support appellant's conviction, we reverse the conviction and render a judgment of acquittal.

### *Background*

In September 2001, appellant was the chief deputy of the Chambers County Sheriff's Department. A jury found appellant guilty of perjury after hearing evidence that appellant directed Deputy John Joslin to file a false DWI (driving while intoxicated) charge against Vernon Coates.[1]

Deputy Brett Hulsey arrested Coates on September 3, 2001 after Coates made two turns without signaling, ran a stop sign, and did not pull over when Hulsey turned on his lights and siren. When Coates finally did stop, he smelled of alcohol and admitted that he had been drinking; however, he did not stumble or stagger. Later, Hulsey found empty beer cans in Coates' truck. At the scene, Hulsey arrested Coates for evading arrest, failing to use his turn signal, and disregarding a stop sign. However, Hulsey did not administer any sobriety tests or arrest Coates for DWI. Instead, he deferred to Joslin, who was more qualified, and who had arrived on the scene with Sergeant David Beck. Coates was somewhat uncooperative when arrested, and he became belligerent at the jail; however, there was conflicting testimony as to whether Coates seemed intoxicated. Jailer Steve Wood, who saw Coates at booking, testified that while Coates was verbally abusive, agitated, and belligerent, he did not appear to be intoxicated. Joslin thought Coates was borderline intoxicated, and Hulsey testified that while he never thought that Coates was intoxicated, another deputy could have had probable cause to believe that Coates was DWI.

At the jail, Hulsey submitted a probable cause affidavit regarding only the traffic offenses. Hulsey then received a phone call from appellant, who had already been notified of Coates' arrest. According to dispatcher and notary Carlton Carrington, when appellant learned that Coates had been arrested and that his attorney was coming to the jail, appellant said: "Good news travels fast."[2] After explaining the

---

1. Appellant was originally charged with aggravated perjury and the lesser included offense of perjury. However, the trial court granted appellant's motion for an instruction that the jury must find appellant not guilty on the aggravated perjury charge and determine appellant's guilt or innocence solely on the lesser perjury charge.

2. Presumably, appellant's comment stemmed from the fact that Coates had a long history with the sheriff's department, including a highly-publicized and controversial arrest for the attempted murder of two deputies. Although the jury did not hear specific details about Coates' history with the department, witnesses testified that relations between Coates, his lawyer, and the sheriff's department were unfriendly, and that people at the

circumstances of Coates' arrest, Hulsey told appellant that he was unsure whether Coates was intoxicated and informed him that Joslin was handling the DWI aspect.

Although Hulsey testified that appellant never ordered him to file a false report, that night Hulsey wrote two offense reports about Coates' arrest. The first mentioned only the odor of alcohol on Coates' breath, while the second added that Coates did not appear to have the normal use of his mental and physical faculties. Similarly, at trial, Hulsey testified that Coates did not appear to have the normal use of his physical and mental faculties and agreed that in such a case, a law enforcement officer would have probable cause to arrest. Hulsey further testified that Coates appeared to be intoxicated and that there was probable cause to arrest him for DWI. However, Hulsey also testified that he was not qualified to judge intoxication at the time of Coates' arrest and stated that he had never believed Coates to be DWI or legally intoxicated.

After his initial conversation with Hulsey, appellant called the jail to speak to Joslin. Joslin had performed the HGN (horizontal gaze nystagmus) test at the jail and determined that Coates was borderline, but not legally intoxicated. Joslin did not perform any other sobriety tests and did not give Coates an intoxilyzer test. Over the phone, Joslin acknowledged to appellant that Coates had bloodshot eyes, smelled of alcohol, and had stumbled slightly while entering the jail. However, Joslin told appellant that he did not believe Coates was legally intoxicated because Coates had not demonstrated sufficient

clues on the HGN test. Joslin also testified that when he told appellant that it would not be fair to charge Coates with a DWI, appellant stated that they needed the DWI in order to suspend Coates' driver's license.

A few minutes later, appellant called the jail again and asked to speak with Joslin on an unrecorded line. According to Joslin, appellant said that he was very knowledgeable about DWIs and wanted Joslin to charge Coates with a DWI "or else." Although he still did not believe that Coates was intoxicated, Joslin filed the DWI charge and included in his probable cause affidavit that he smelled "a very strong odor of an alcoholic beverage on [Coates'] breath and person." Joslin also wrote a report in which he reiterated that Coates smelled of alcohol and stated that he thought Coates "was intoxicated to the point that he was a danger to himself and others from losing the normal use of his mental and physical faculties."[3] Joslin testified that these statements were lies and that he filed the documents in violation of the law. Joslin also testified that he told Hulsey, Wood, and Beck that he did not think Coates was intoxicated. Joslin also claimed that he videotaped his encounter with Coates and that he commented on the tape: "I don't think it is there; I think he is a little short." However, Joslin was unable to locate any copies of this video.

Joslin testified that he thought he would be fired if he did not file the DWI charge. According to Joslin, appellant made it clear that anyone who broke the chain of command and "went above his head" would

---

jail treated Coates as if he were a special case the night of his arrest.

**3.** Joslin claimed to have written an original report on the DWI charge, but neither he nor the district attorney's office was able to locate it. Joslin also testified that he did not write

the supplemental report used as evidence at trial and did not know where it came from; Joslin stated, however, that the supplemental report fairly accurately described what happened the night of Coates' arrest.

be fired. Several other witnesses similarly testified that the tense work atmosphere and rigid structure implemented during appellant's tenure were stressful and that employees constantly feared losing their jobs.[4] Furthermore, Hulsey testified that when Joslin finished speaking with appellant the night of Coates' arrest, Joslin seemed upset, threw his hands in the air, and said that he could not believe he had to file the DWI charge. Wood also testified that Joslin seemed worried after his conversation with appellant. According to Wood, Joslin told him that appellant had ordered Joslin to change his report, and that he would lose his job if he failed to do so. Finally, magistrate Tommy Henry also felt that appellant tried to intimidate people; when Henry questioned appellant about the differences in Hulsey's and Joslin's probable cause affidavits, appellant became "testy" and told Henry that "we charge them; you read them their rights."

The day after Coates' arrest, appellant summoned Joslin to his office to discuss Joslin's original report. According to Joslin, appellant told him to delete any references to appellant and their second phone conversation. However, appellant also told Joslin not to lie in his report and to tell the truth if anyone ever asked about their second telephone conversation. Joslin revised his report and gave both the original and revised copies to appellant.

In April 2002, Ernest Rodney Yarbrough, who was in charge of the Criminal Investigation Division of the sheriff's department, was conducting an internal investigation regarding Beck.[5] Yarbrough believed that appellant had tampered with this investigation, because after Yarbrough had obtained an affidavit, appellant allegedly spoke with the affiant, who subsequently wanted to change his story. Yarbrough and appellant argued about the investigation, and appellant confiscated Yarbrough's files. Yarbrough thought he would be fired over the disagreement; however, in May 2002, the sheriff altered the chain of command so that Yarbrough no longer reported to appellant. Upon learning of this change, Joslin and a few other deputies visited Yarbrough in his office.[6] Although the conversation was casual, Yarbrough came to believe that some wrongdoing had occurred, and he relayed his concerns to the sheriff.

Around the same time, in May 2002, Texas Ranger Frank Huff began investigating Joslin for allegations of sexual assault of a female deputy.[7] In the course of this investigation, Joslin admitted to Huff that he had committed a crime regarding the Coates arrest. Huff's investigation eventually included Hulsey and appellant. As part of his investigation, Huff arranged a recorded phone conversation between Hulsey and appellant, during which appellant told Hulsey to tell the truth.

4. Only one witness, jailer Steve Wood, testified that everyone seemed to like working under appellant's leadership.

5. The record does not reveal the nature of this investigation. Although Beck was one of the deputies on the scene the night of Coates' arrest, the investigation does not appear to be related to the Coates incident.

6. In April 2002, Joslin left the Chambers County Sheriff's Department to work for Harris County. Joslin had been working for Harris County for only a few weeks when the Chambers County Sheriff rehired him and informed Joslin that he no longer needed to report directly to appellant. Joslin's conversation with Yarbrough took place around this time.

7. Joslin contended that the allegations were for sexual harassment, not sexual assault. Joslin was not prosecuted on these charges pursuant to his deal with the State to testify at appellant's trial.

Eventually, the Chambers County District Attorney's Office charged Hulsey with a felony offense stemming from the DWI charge against Coates. However, Hulsey's case never proceeded to trial because Hulsey testified at appellant's trial pursuant to an agreement with the State. The district attorney's office also charged Joslin with a felony for falsifying the DWI charges against Coates. Like Hulsey's, Joslin's case did not proceed to trial because Joslin agreed to testify at appellant's trial. The State charged appellant with aggravated perjury. Appellant did not testify at trial.

### Standard of Review: Legal Sufficiency

Appellant argues that the evidence is legally and factually insufficient to find him guilty of perjury beyond a reasonable doubt. In his seventh sub-point of error, appellant argues that the State presented no evidence that Joslin made the statements in his probable cause affidavit under oath. We find that the evidence is legally insufficient to prove that Joslin made the statements under oath.

▮ In evaluating the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vasquez v. State,* 67 S.W.3d 229, 236 (Tex.Crim.App.2002). This standard of review applies to cases involving both direct and circumstantial evidence. *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim.App.1995). Although we consider all of the evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the jury. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testi-

mony, and it is the exclusive province of the jury to reconcile conflicts in the evidence. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App.2000). If a reviewing court determines that the evidence is legally insufficient to support an appellant's conviction, it must render a judgment of acquittal. *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996).

### Analysis

To obtain a conviction of perjury in this case, the State was required to prove beyond a reasonable doubt that appellant, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Joslin to commit perjury. TEX. PEN. CODE ANN. § 7.01(a), 7.02(a)(2) (Vernon 2003). A person commits perjury if, with intent to deceive and with knowledge of the statement's meaning, he makes a false statement under oath. TEX. PEN.CODE ANN. § 37.02(a)(1) (Vernon 2003).

▮ To constitute a valid oath, for the falsity of which perjury will lie, there must be, in the presence of a person authorized to administer it, an unequivocal act by which the affiant consciously takes upon himself the obligation of an oath. *Weadock v. State,* 118 Tex.Crim. 537, 546, 36 S.W.2d 757, 762 (1931). In a perjury case, in order to prove that a statement in an affidavit was made under oath, the State must present witnesses who testify that the affiant appeared before a notary or other officer authorized to administer the oath at the time the affiant signed the affidavit. *Lowry v. State,* 164 Tex.Crim. 178, 181, 297 S.W.2d 848, 850 (1956). In *Lowry,* witnesses identified the appellant's signature and the signature of notary S.B. Lusby; the State also proved that Lusby was a notary public. *Id.* at 180, 849. However, no witnesses testified that Lowry had appeared before the notary or that

the notary had administered an oath to Lowry. *Id.* The court held that the jurat, even with proof of signatures and Lusby's authority to administer an oath, was legally insufficient to establish that Lowry had appeared before an appropriate officer and made the statements under oath. *Id.* at 181, 850. Although Lusby was a close friend and business associate of Lowry's and had also testified that he had not administered any oath in connection with Lowry's statement, the court explicitly noted that Lusby's testimony did not influence its holding. *Id.* at 182, 850. Additionally, in its opinion on rehearing, the court emphasized that its holding was a result of the "entire absence of any showing in the record before us that the appellant ever appeared before Lusby at the time he signed the instrument in question." *Id.* at 182, 851.

█ In appellant's case, the State demonstrated that both Joslin and notary Carrington signed the affidavit. However, no witnesses testified that Joslin actually appeared before Carrington, that Carrington administered an oath to Joslin, or that Joslin signed the affidavit in Carrington's presence. Thus, under *Lowry*, the State's evidence is insufficient to establish that Joslin made the statements in his probable cause affidavit under oath. Accordingly, we hold that the evidence is legally insufficient to support appellant's perjury conviction.

Like the dissent, we recognize that since *Lowry*, at least one intermediate court has affirmed a perjury conviction based on facts similar to those in appellant's case. *See Quinones v. State*, No. 05–01–01876–CR, 2003 WL 21525305, at *1 (Tex.App.-Dallas July 8, 2003, no pet.) (not designated for publication) (reasoning that an affidavit is simply another way to manifest an oath). The *Quinones* court cited *Martin v. State*, which suggests that an affidavit

with a proper jurat suffices to convict for perjury. *Martin v. State*, 896 S.W.2d 336, 339 (Tex.App.-Amarillo 1995, no pet.) ("[An affidavit] is a pledge in written form ... constituting prima facie evidence that an oath was taken."). Citing *Lowry*, the *Martin* court defined "oath" as a pledge to act in a truthful and faithful manner, "made manifest through an 'unequivocal act by which [the individual] consciously takes upon himself the obligation of an oath' before someone authorized to administer an oath." *Id.* at 339. The court also asserted that "simply pledging to act truthfully and faithfully before someone authorized to administer oaths constitutes a valid oath." *Id.*

However, while *Martin* and *Quinones* recognize that swearing before an authorized official is inherent in the definition of "oath," neither case addresses *Lowry's* requirement that the State must present testimony that such swearing actually occurred. As noted by the dissent, the *Martin* court held that the parties' stipulations at trial constituted sufficient evidence that the appellant had taken an oath, even though the appellant's original statement was unaccompanied by a jurat. 896 S.W.2d at 337, 339. Citing *King v. State*, 167 Tex.Crim. 440, 442, 320 S.W.2d 677, 678 (1959), which held that other evidence could prove the existence of an oath in the absence of a jurat, the *Martin* court asserted that failure to comply with swearing formalities does not negate the existence of an oath and reasoned that a party may "present other evidence to prove that particular statements were sworn to in spite of the defective instrument." *Id.* at 339. However, in appellant's case, the instrument itself is not defective, as it bears a proper jurat with the signatures of both Joslin and Carrington, and the parties did not stipulate that Joslin actually swore before the notary.

Accordingly, we believe that *Martin* is factually distinguishable whereas the facts in *Lowry* are nearly identical to those in appellant's case. Furthermore, although we acknowledge the logic of *Quinones* and *Martin,* particularly because we are persuaded that a proper affidavit should substitute for live testimony under oath, we cannot ignore precedent from the Court of Criminal Appeals, even if it is fifty years old. Therefore, because we are not the court of last resort, we are constrained to follow *Lowry,* which has not been overruled or limited by the Court of Criminal Appeals.

Additionally, we do not believe that Joslin's testimony prevents the application of *Lowry* to appellant's case. Joslin testified that he signed the probable cause affidavit under appellant's orders even though he did not believe that Coates was DWI, and as the dissent notes, the testimony of other witnesses corroborated this position. However, the trial testimony fails to establish that Joslin appeared before the notary and signed the affidavit in his presence. While we acknowledge the dissent's concern that "demanding rigid adherence to swearing formalities" can be problematic, we simply cannot ignore the controlling precedent of *Lowry.*

Because we find the evidence to be legally insufficient, we need not address appellant's remaining sub-points of error or the issue of factual insufficiency. *English v. State,* 171 S.W.3d 625, 630 (Tex.App.-Houston [14th Dist.] 2005, no pet.) We reverse appellant's conviction and render a judgment of acquittal.

YATES, J. dissenting.

LESLIE BROCK YATES, Justice, dissenting.

I respectfully disagree with the majority's conclusion that the evidence is legally insufficient to support appellant's conviction. Under the Penal Code, a person commits perjury if he makes a false statement under oath with the intent to deceive and with knowledge of the statement's meaning. TEX. PENAL CODE ANN. § 37.02(a)(1) (Vernon 2003). While "oath" is not statutorily defined, it has been defined as "a pledge to act in a truthful and faithful manner." *Martin v. State,* 896 S.W.2d 336, 339 (Tex.App.-Amarillo 1995, no pet.).

The majority found the State failed to prove that Joslin's statements in his probable cause affidavit were made under oath. In making its determination, the majority relied on *Lowry v. State,* 164 Tex.Crim. 178, 297 S.W.2d 848 (1957), a nearly fifty-year-old case that has been cited by only one intermediate Texas appellate court. In *Lowry,* the State relied on witness identification of the appellant's and notary's signatures, the presence of a jurat, and the fact that the notary was authorized in the relevant county to prove that a legal oath had been administered. *Id.* at 849. The Court of Criminal Appeals found this evidence was insufficient to prove the appellant had executed a legal oath because the State did not show the notary actually administered the oath to the appellant or that the appellant ever appeared before the notary. *Id.* at 850.

The majority analogizes the instant case to *Lowry,* which it notes "we are constrained to follow" despite the majority's recognition "that a proper affidavit should substitute for live testimony under oath." I find this case distinguishable from *Lowry.* Here, Joslin *admitted* he committed perjury because he felt threatened by appellant. Moreover, several witnesses corroborated Joslin's testimony and described his reaction the night appellant was arrested. Deputy Hulsey testified that he saw Joslin on the phone with appellant and

that afterward Joslin was visibly upset and complained he could not believe he had to file a DWI against Coates. Also, Wood testified that Joslin confided in him that appellant ordered Joslin to change his report and that Joslin feared losing his job unless he complied. Thus, there is corroborating evidence of Joslin's accomplice witness testimony. *See Cathey v. State,* 992 S.W.2d 460, 462–63 & n. 4 (Tex.Crim.App. 1999) (noting that accomplice testimony must be corroborated with nonaccomplice evidence). This evidence, viewed in the light most favorable to the verdict, could enable a rational fact-finder to find beyond a reasonable doubt that Joslin committed perjury.

Finally, the majority concedes that two more recent cases suggest a notarized affidavit may suffice for a legally administered oath. *See Quinones v. State,* No. 05–01–01876–CR, 2003 WL 21525305, at *1 (Tex.App.-Dallas July 8, 2003, no pet.) (not designated for publication); *Martin,* 896 S.W.2d at 339. In *Quinones,* the appellant argued the evidence was legally insufficient to support her conviction because the notary did not administer her oath when she signed her affidavit. *See Quinones,* 2003 WL 21525305, at *1. The Dallas Court of Appeals affirmed her conviction, noting that "an affidavit is simply another way to manifest an oath." *Id.* (citing *Martin,* 896 S.W.2d at 339). In *Martin,* the Amarillo Court of Appeals described an oath as "an 'unequivocal act by which [the individual] consciously takes upon himself the obligation of an oath' before someone authorized to administer an oath." *Martin,* 896 S.W.2d at 339 (citing *Lowry,* 297 S.W.2d at 850). The *Martin* court went on to note that in that case, "the stipulations executed by the parties evidenced that the Appellant orally pledged to the veracity of her … statement." *Id.* These cases recognize the difficulty of demanding rigid adherence to swearing formalities. Simi-

larly, the existence of a technical defect in Joslin's affidavit should not negate his testimony in which he admitted that he intended to and did commit perjury under appellant's order.

For these reasons, I respectfully dissent.