Affirmed and Opinion filed June 6, 2006









Affirmed
and Opinion filed June 6, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00616-CR

____________

 

WILLIAM DRUMWRIGHT, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 122nd
District Court 

Galveston County, Texas

Trial Court Cause No. 04CR1302

 



 

O P I N I O N

A jury found appellant William Drumwright
guilty of indecency with a child and assessed a punishment of six years=
incarceration.  In two points of error,
appellant contends that the evidence is legally and factually insufficient to
sustain his conviction.  We affirm.

Background

Appellant is the ex-husband of Virginia
Drumwright, who is the mother of the complainant, S.P.[1]  Virginia testified that on May 13, 2004, when
S.P. was thirteen, S.P. stated that appellant had molested her.  Earlier that evening, appellant had informed
Virginia that S.P. had been disrespectful to him, so Virginia had approached
her daughter about the situation.  In
response, S.P. asked whether Virginia remembered what ACandy said her
brother did to her@ and then stated that appellant had raped
her.[2]  S.P. explained that about a year earlier,
when she was almost thirteen, appellant had jumped on her while she was lying
on the couch, pulled her pants down, and bumped his penis against her vagina
for ten to fifteen minutes.  Appellant
also told S.P. not to tell her mother. 
Virginia testified that she sent S.P. upstairs and immediately
confronted appellant.  According to
Virginia, appellant responded that A[he] knew these
kids would break [them] up somehow@ and stated that A[he=d] never admit it.@  After confronting appellant, Virginia asked
S.P. if she was telling the truth and told her that she would be very hurt if
S.P. were lying about the abuse.  S.P.
assured her mother that she was telling the truth.  Virginia testified that she planned to leave
immediately with the children, but that appellant ultimately left instead.  Virginia testified that appellant was
uncharacteristically calm when he decided to leave.








Virginia, who was an officer with the
Galveston Police Department at the time, told fellow officer Clemente Garcia
about S.P.=s allegations when she went to work the
next morning.  Virginia testified that
Officer Garcia spoke with S.P. at the house and that S.P. was also interviewed
at the Advocacy Center in Galveston on May 14, 2004.  Virginia was not present during S.P.=s medical exam or
her  meeting with the district
attorney.  Virginia filed for divorce
because of S.P.=s allegations, but she insisted that she
had not told S.P. to fabricate the allegations in order to gain custody of her
younger son.  She testified that she
believed S.P. instead of appellant because she Ahad to protect
[her] daughter@ and could Atell by looking in
[appellant=s] eyes that he was lying.@  Virginia also stated that S.P. had never
wavered in her account since May 13, 2004. 

On cross-examination, Virginia
acknowledged that as part of her police officer training, she had taken a class
about sexual abuse and sex offenders a few months before S.P. told her about
the molestation.  However, Virginia
denied telling appellant that it was easy to make sexual abuse allegations
without proof.  Virginia also admitted
that she had been married to S.P.=s father when she
first met appellant but denied that appellant believed she was single.  Virginia testified that the only additional
detail S.P. had provided regarding the incident on the couch was that it had
occurred around Atennis time,@ meaning April
2003.  She acknowledged that she did not
tell any family members about S.P.=s allegations
until roughly two weeks after S.P.=s disclosure.  Virginia testified that her marriage to
appellant had been troubled, that she had spoken to an attorney just a few days
after May 13, and that her divorce from appellant was pending.  Virginia denied that their marital problems
stemmed from financial difficulties, stating that appellant was mean, rude, and
yelled a lot.  She testified that
appellant had hit her once about six years ago, but she did not report the
incident because she was not injured. 
Virginia stated that appellant often talked to her all night about
wanting to save their marriage. 

Pediatrician Dr. James Lukefahr, a
specialist in child abuse and neglect who examined S.P., summarized S.P.=s medical records
and the results of her examinations.  Dr.
Lukefahr read a portion of S.P.=s interview with a
nurse, in which she described the incident on the couch and stated that
appellant was Aalways touching [her] on [her] breasts or
[her] front privates under [her] clothing.@  The notes indicated that S.P. did not
maintain eye contact and folded into a fetal position when describing the
encounter on the couch.  Dr. Lukefahr  testified that although S.P.=s examination
revealed no physical signs of abuse, such results were consistent with the type
and timing of the abuse she described. 
Ultimately, Dr. Lukefahr opined that S.P. had been sexually assaulted.








On cross-examination, Dr. Lukefahr
acknowledged that he had not personally examined S.P. but had consulted with
the nurse who performed the examination. 
He also acknowledged that he had previously testified for the
prosecution about a hundred times but only four times for the defense.  Reiterating that S.P.=s exam showed no
signs of physical trauma, Dr. Lukefahr agreed that those results did not rule
out the possibility of a false allegation. 
He testified that nothing in S.P.=s records excluded
the possibility that S.P. believed she had been assaulted only because it had
been repeatedly suggested to her.  Dr.
Lukefahr opined that of the 3,500 cases he had reviewed, he immediately
recognized only Ahalf a dozen@ as false
allegations based on the medical exam; however, he did not know how many
allegations ultimately turned out to be false. 

S.P., who was fourteen and in ninth grade
at the time of trial, testified that she first talked about the molestation in
May 2004, when she was in eighth grade. 
S.P. explained that she and her friend Windy Garcia were discussing a book
about teenage sex when she told Windy: AWell, my stepdad
did it to me, too.@ 
S.P. testified that she did not fabricate the allegation because of the
material she read in the book.  S.P. told
her mother about the abuse on May 13, about two weeks after she confided in
Garcia, and testified that she did not tell her mother earlier because she was
scared.  S.P. testified that when she was
in the seventh grade, appellant molested her on the living room couch.  According to S.P., they had been discussing
tennis when appellant climbed on top of her, pulled down both their pants, and
touched her vagina with his penis for about five minutes.  S.P. also testified that appellant had touched
her inappropriately many times both before and after the couch incident,
although she could not remember when the touching had started.  More specifically, S.P. recalled that when
she and appellant were once driving home from Wal-Mart, he grabbed her breasts
and offered to give her twenty dollars a week if she Awould give him
what he wanted,@ meaning sex.  S.P. testified that appellant once forced her
to touch his penis.  S.P. testified that
she understood the difference between the truth and a lie and that no one had
told her what to say. 








On cross-examination, S.P. acknowledged
that Garcia was being sexually abused and that the two of them often talked
about the situation.  She reiterated that
she made the allegations against appellant about two weeks after she and Garcia
discussed the sex book.  S.P. admitted
that after she made the allegations against appellant, her mother was no longer
upset with her for being disrespectful to him. 
S.P. testified that at the time, she did not know the difference between
rape and molestation and denied having seen an episode of South Park that
described molestation.  Although S.P.
could not remember the day or month that the couch incident occurred, she
stated that it happened during tennis season, that she had been watching
cartoons, and that her two brothers were either upstairs or outside.  She acknowledged that on May 20, 2004, a week
after making the allegations, she went to the prom.  She testified that appellant often yelled at
and hit her but that she did not tell anyone about it.  She explained that one time she told
appellant that she had been at tennis practice when she had actually been at a
male friend=s house because she thought appellant
would make fun of her or be angry if he knew the truth.          

Windy Garcia testified that in early May
2004, S.P. told her that appellant had tried to rape her and was always
touching her.  Garcia stated that S.P.
had seemed sad and made a Aweird face@ immediately
before confiding in Garcia.  Garcia
testified that she then told S.P. that she too had been sexually abused but
that no one had believed her.  Garcia
stated that S.P. had not yet told her mother about appellant when she confided
in Garcia.  Finally, Garcia testified
that she did not tell S.P. to fabricate the allegations against appellant.

Officer Clemente Garcia of the Galveston
Police Department testified that on May 14, 2004, Virginia Drumwright told him
about S.P.=s allegations against appellant and was Ahighly upset.@[3]  He also stated that when he interviewed S.P.,
S.P. was shaking and crying and kept her eyes downcast because she was
uncomfortable.  Officer Garcia testified
that neither he nor Virginia told S.P. what to say.








On cross-examination, Officer Garcia
testified that S.P. had stated that appellant offered her twenty dollars a week
for sex.  He stated that S.P. had accused
appellant of touching her breasts when she and appellant were driving back from
AKrogers,@ not
Wal-Mart.  Officer Garcia testified that
he had significant experience Agathering
information@ from people and that S.P.=s failure to
maintain eye contact could indicate that she was lying. 

Appellant presented three defense
witnesses and testified in his own defense. 
Psychologist Dr. Carmen Petzold testified that she had read peer-reviewed literature discussing
false allegations of sexual abuse and had testified in over a hundred criminal
and civil cases for both the State and the defense.  Dr. Petzold completed a psychological
evaluation of appellant in May 2005 based on a series of objective tests,
appellant=s previous work product, and two clinical
interviews she had conducted in 2004. 
According to Dr. Petzold, appellant had Ahigh average to
superior intellectual abilities@ and an
introverted personality and was self-assured, self-disciplined, and Aunlikely to react
spontaneously or impulsively.@  The results indicated that appellant
essentially functioned normally, although he had become withdrawn and reluctant
to interact with people due to S.P.=s
allegations.  Dr. Petzold opined that A[u]nlike most
people who are convicted [sex] offenders, [appellant] had a more than adequate
fund of accurate sexual information.@  Dr. Petzold acknowledged that there was no Amagic listing of
indices for a sex offender.@  She stated that she had never interviewed
S.P. and therefore had no opinion about S.P.=s
truthfulness.  Dr. Petzold summarized
several studies finding that false allegations of sexual abuse often arise in a
divorce context and stated that when she interviewed appellant, she was aware
that he and Virginia were contemplating a divorce.








On cross-examination, Dr. Petzold testified
that she had reviewed the videotaped interview of S.P. but not S.P.=s medical records,
Virginia=s videotaped
statement, or the offense report.  She
also testified that she had earned $4,200 for being an expert in appellant=s case and
estimated that she earned less than fifty percent of her annual income from
testifying, although she could not remember how many times she had testified for
the State in a felony matter at the guilt/innocence phase of a jury trial.  Dr. Petzold testified that she had given
presentations to the defense lawyers= bar associations
of Harris County and Galveston County, but not to the District Attorneys= offices of those
counties.  Dr. Petzold stated  that she had interviewed appellant for less
than eleven hours, that the first four written tests appellant had taken in
September 2004 were unsupervised Aself-reporting@ tests, and  that the others were unobjective
surveys.  Dr. Petzold did not know the
error rate for any of the tests, but she asserted that she had administered
them to hundreds of adults and that a person could not Afail@ them.  Dr. Petzold acknowledged that there is no
conclusive study regarding false allegations of sexual abuse, but she described
a major study that found false allegations of sexual abuse in only two percent
of nine thousand divorce cases.[4]

On re-direct examination, Dr. Petzold
clarified the results of the study, insisting that  the appropriate focus should be the two
hundred and nine cases that involved allegations of abuse, not all nine
thousand divorce cases.  She also stated
that as a psychologist, she typically did not have access to offense reports or
witness statements, although she acknowledged that she had not asked to see
S.P.=s medical
reports.  Dr. Petzold also asserted that
the tests she administered to appellant were not designed to be pass/fail, and
that appellant had provided a valid result.

William Drumwright, Sr., appellant=s father and a
teacher, testified that Virginia had not been the sole provider for the family
because appellant was an eBay seller and a photographer.  He explained that the family had lived
rent-free in a house owned by appellant=s parents.  Appellant=s father testified
that the family was Avery close,@ that he had
observed appellant and S.P. together more than fifty times, and that S.P. had
never complained to him about appellant. 
Although appellant=s father admitted that he had a vested
interest in his son=s happiness and safety, he stated that he
would not lie to protect appellant.








On cross-examination, appellant=s father admitted
that he blamed Virginia for ending 
appellant=s marriage.  He also stated that he had changed the locks
on the family=s rented house on May 20, 2004 and denied
having an agreement with Virginia that would allow her to stay there for a week
after S.P. made the allegations. 
Appellant=s father agreed that when Virginia was at
work, appellant was in charge of the children. 
He also admitted that he had no personal knowledge about what happened
in the privacy of appellant=s home.

Petra Drumwright, appellant=s mother and a
retired teacher, testified that she had observed appellant with S.P. at least
four or five times a year at family events and that her son=s marriage to
Virginia was Arocky.@  She testified that she had spoken with S.P.
many times and thought that S.P. was honest only Asometimes.@  She explained that in April 2002, she had
invited S.P. on a class trip to San Antonio. 
According to appellant=s mother, S.P.
said she had enough money to pay for a blouse when in reality she did not.  Another teacher paid for S.P.=s blouse, and
appellant=s mother had to reimburse her.  Appellant=s mother testified
that she would not lie to protect her son. 
On cross-examination, appellant=s mother
acknowledged that S.P. had been eleven years old when the blouse incident
occurred.  She also admitted that she had
no personal knowledge about what happened in her son=s house when she
was not there.








Appellant testified in his own defense and
repeatedly denied S.P.=s allegations.  Appellant testified that he had believed that
Virginia was single when he first met her and later learned that she was still
married.  He stated that during their
marriage, he made money by trading stocks, selling items on eBay, and
occasionally doing photography. 
Appellant characterized his relationship with S.P. as Apretty good@ and stated that
he had taught her how to play tennis and golf. 
He emphasized that while he had sat on the couch with S.P. on numerous
occasions, he had never touched her inappropriately.  He agreed that he occasionally disciplined
S.P. for failing to do her chores but denied that he had ever hit S.P. or her
mother.  He claimed that S.P. voluntarily
admitted that she had lied about having tennis practice one day when she
actually went to a boy=s house. 
Appellant explained that S.P. had her own bedroom and that she usually
left for school before he had awakened in the morning.  Appellant stated that Virginia typically left
for work before appellant or any of the children had awakened.

Appellant testified that when Virginia
accused him of molesting S.P., he vehemently denied it and stated: A[Y]ou=ll never get me to
admit it because I didn=t do it.@  When Virginia asserted that A[c]hildren don=t lie,@ appellant
replied: AWell, I=m sure there=s some instances
when they do.@ 
Appellant testified that in August or September of 2003, Virginia
suddenly announced that she was going to divorce appellant but did not give a
specific reason.  According to appellant,
Virginia frequently threatened to take away their son and not allow appellant
to see him again.  Appellant acknowledged
telling his wife that he hated her in 2003, but he did not remember the
argument=s context.  He testified that in April or May of 2004,
when Virginia was taking the class about sex offenders, she said that she was
amazed at Ahow easy it was for females to make
allegations toward the male with no proof.@  Appellant stated that on May 9, 2004, the day
he allegedly fondled S.P.=s breasts, the entire family had gone
shopping for S.P.=s prom dress at Dillards, not at Kroger or
Wal-Mart as S.P. claimed.  He testified
that S.P. was sitting in the back seat of the car with her brothers, and he
denied touching her in any way.

On cross-examination, appellant admitted
that he had not been legally divorced from his first wife when he began dating
Virginia, even though he previously had told the jury otherwise.  Appellant admitted that the family had a
lease on the house they had lived in, despite his father=s and his own
prior testimony to the contrary, although they did not have  to pay rent. 
He testified that when Virginia confronted him about S.P.=s allegations, he
said AI will never admit
it@ because he did
not molest S.P.  Appellant believed that
the allegations were part of a Abig conspiracy@ by Virginia,
although he could not explain why S.P. had talked with Windy Garcia before she
confided in her mother if such a theory were true.  He acknowledged that he had spanked the
children but did not remember hitting S.P.=s brother so hard
that he had marks on his legs for two days, as S.P. had told the nurse.








Legal Sufficiency Analysis

In evaluating the legal sufficiency of the evidence, we must
view the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt.  Vasquez
v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).  This standard of review applies to cases
involving both direct and circumstantial evidence.  King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995).  Although we
consider all evidence presented at trial, we may not re-weigh the evidence and
substitute our judgment for that of the jury. 
King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  The jury is the exclusive judge of the
credibility of witnesses and of the weight to be given their testimony, and it
is the exclusive province of the jury to reconcile conflicts in the
evidence.   Wesbrook v. State, 29
S.W.3d 103, 111 (Tex. Crim. App. 2000).

To convict appellant of indecency with a
child, the jury needed to find beyond a reasonable doubt that appellant engaged
in sexual contact with S.P. or caused S.P. 
to engage in sexual conduct.  Tex. Pen. Code Ann. ' 21.11(a)(1)
(Vernon 2003).  Viewing the evidence in
the light most favorable to the verdict, we find it to be legally sufficient to
support appellant=s conviction.  Virginia testified that S.P. told her the
allegations were true and had never wavered in her account.  Virginia also insisted that she had not told
S.P. to lie in order to gain custody of her youngest child.  She stated that when she confronted
appellant, she could tell he was lying by the look in his eyes.  She denied ever telling appellant that it was
easy to make false allegations of sexual abuse. 
Officer Garcia testified that both Virginia and S.P. had seemed
genuinely upset the day after S.P. made the allegations.  Dr. Lukefahr recounted that during her
medical exam, S.P. had folded into a fetal position; he opined that she had
been sexually assaulted.  S.P. testified
that she told Windy Garcia about the abuse two weeks before she told her mother
and insisted that she did not fabricate the allegations.  Garcia corroborated S.P.=s testimony and
noted that S.P. seemed sad immediately before she spoke about the abuse. 








Viewing the evidence in the light most
favorable to the verdict, we find that the jury could have found the essential elements of the offense
beyond a reasonable doubt.  Therefore, we
find the evidence to be legally sufficient and overrule appellant=s first point of error.

Factual Sufficiency Analysis

In a factual sufficiency review, we must view all the
evidence in a neutral light and determine whether the jury was rationally
justified in finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d 477, 484
(Tex. Crim. App. 2004).  Evidence is
factually insufficient if, when considered by itself, the evidence supporting
the verdict is too weak to support a finding of guilt beyond a reasonable doubt
and thus renders the conviction clearly wrong and manifestly unjust.  Id.; Vasquez, 67 S.W.3d
at 236.  Alternatively, evidence is
factually insufficient if the evidence contrary to the verdict is strong enough
that the beyond-a-reasonable-doubt standard cannot be met, even if evidence
supporting guilt outweighs the evidence to the contrary.  Zuniga, 144 S.W.3d at 484.  The reviewing court may not substitute its
own judgment for that of the jury and may not intrude upon the jury=s role as the sole
judge of the weight and credibility of witness testimony.  Vasquez, 67 S.W.3d at 236.








We find the evidence to be factually
sufficient to support appellant=s conviction.  Appellant denied molesting S.P. and testified
that they had a good relationship.  He
believed that Virginia had told S.P. to fabricate the allegations in order to
win custody of their son and asserted that after taking a class about sex
offenders, Virginia had commented that it was easy to make false allegations of
sexual abuse.  However, appellant could
not explain why S.P. had confided in Garcia before talking to her mother if
Virginia had told S.P. to lie.  Dr.
Petzold could not state definitely that appellant did not molest S.P., even
though he had an Aadequate fund of accurate sexual
information,@ unlike most sex offenders.  Additionally, Dr. Petzold did not know the
error rates for any of the psychological tests she administered to appellant,
and she admitted that there is no Amagic listing of
indices@ for sex
offenders.  Furthermore, appellant=s parents
acknowledged that appellant spent time alone with the children while Virginia
was at work and they did not know what he did when alone with S.P.  While statements that Virginia had been
married when she began dating appellant and that S.P. had lied about having
money to buy a blouse were intended to damage Virginia=s and S.P.=s credibility, the
jury apparently found S.P. and Virginia to be credible.  See Vasquez, 67 S.W.3d at 236.  The jury also was free to believe Officer
Garcia=s and Windy Garcia=s testimony that
S.P. seemed genuinely upset, as well as Dr. Lukefahr=s opinion that
S.P. had indeed been molested.  See id.

Viewing the evidence in a neutral light,
we find it to be factually sufficient to support appellant=s conviction.  The supporting evidence is not so weakCnor is the
contrary evidence so overwhelmingly strongCas to render the
verdict clearly wrong and manifestly unjust.  
We overrule appellant=s second point of
error and affirm the trial court=s judgment.

 

 

 

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

Judgment
rendered and Opinion filed June 6, 2006.

Panel
consists of Chief Justice Hedges and Justices Yates and Guzman.

Do
Not Publish C Tex.
R. App. P. 47.2(b).











[1]  The family
included three children: S.P. and her brother, who were appellant=s stepchildren, and a younger boy, who was appellant=s and Virginia=s
biological son.  The family lived in
Galveston in a house owned by appellant=s
parents.





[2]  Candy was a friend of Virginia=s who had been raped by her
brother. 
Virginia had told S.P. about Candy about five years earlier.





[3]  Officer Garcia
testified that he was not related to Windy Garcia.





[4]  More
specifically, the study counted two hundred and nine allegations of sexual abuse in nine
thousand divorce cases.  Of those two
hundred and nine allegations, fifty percent were true, thirty-three percent
were false, and seventeen percent were Aundecided.@  Dr. Petzold agreed
that the results indicated that roughly two percent of the nine-thousand
divorce cases involved false allegations of sexual abuse.