# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-07-00578-CR

---

**Sylviano Martinez-Olivares, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. D-1-DC-06-204018, HONORABLE DONALD LEONARD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Sylviano Martinez-Olivares[1] guilty of indecency with a child, *see* Tex. Penal Code Ann. § 21.11(a)(1) (West 2003), and assessed punishment at twenty years' imprisonment and a $10,000 fine. In two points of error, Martinez-Olivares argues that the evidence was legally insufficient to support the verdict and that the prosecutor violated his constitutional rights by commenting on his failure to testify. Having found no reversible error, we affirm the judgment of conviction.

---

[1] The judgment refers to appellant as "Salviano Martinez." Various items in the record refer to him as "Salviano Oliveras Martinez," "Salviano Olivares-Martinez," "Sylviano Martinez," "Silviano Martinez-Olivarez," and "Sylviano Martinez-Olivare." We will refer to appellant as he refers to himself in this appeal—"Sylviano Martinez-Olivares."

**FACTUAL AND PROCEDURAL BACKGROUND**

Around 9:00 p.m. on the evening of July 24, 2006, Marciano Martinez, his wife Maria,[2] and their four children returned home from visiting a family friend. While Marciano went to the bathroom to shower and Maria prepared to breastfeed her youngest child, the complainant, three-year old R.M., played in the living room. At some point, Maria began looking for R.M. so she could bathe her. After discovering that R.M. was no longer in the living room, Maria looked in front of the house. When she did not find R.M. in the front yard, she went back inside, got a flashlight, and ran to the backyard where she found R.M. and Martinez-Olivares. Martinez-Olivares, Marciano's cousin, had been staying at the Martinez home for approximately six months. The Martinez children called Martinez-Olivares "uncle," but he did not share in any childcare duties such as bathing the children or helping them go to the bathroom. Maria testified that Martinez-Olivares had "one knee on the ground and the other one . . . flexed" and "had [R.M.] in between his legs." R.M., who was crying, had no pants on. Her back was towards Martinez-Olivares and her body was "touching his body." Maria testified that Martinez-Olivares's clothing "was all scattered all over his waist from where he was. He didn't have anything on." She did not remember whether she saw his penis. Maria testified that the only thing Martinez-Olivares said to her that evening was "sorry Maria."

Maria yelled for Marciano, then "picked something up" and said she "was going to kill" Martinez-Olivares, but did not actually strike him. From the bathroom, Marciano heard Maria

---

[2] Because Marciano and Maria have the same surname, we will refer to them by their first names to avoid confusion.

2

scream and say that Martinez-Olivares "was raping the daughter." Marciano got dressed and ran to the backyard where he found Maria dressing R.M. and Martinez-Olivares standing seven to eight feet away wearing just his pants. Maria and Marciano's oldest son called the police. Austin Police Officer James Savage was the first responder, and upon realizing that everyone at the scene spoke only Spanish, called Officer Rolando Gutierrez to translate. Child Abuse Detective Gizette Gaslin, crime scene specialist Jennifer Mezei, and a victim services specialist were also called to the scene. Mezei took photographs of the scene and Martinez-Olivares, including a close-up photo of his pants because of a "darkened stain" that "appeared to be possibly blood" and "two or three spots of apparent moisture." Mezei also swabbed Martinez-Olivares's penis for possible DNA evidence.[3]

Martinez-Olivares was arrested and indicted on three counts of aggravated sexual assault of a child, two counts of indecency with a child by contact, and three counts of indecency with a child by exposure. In count one, he was charged with intentionally and knowingly causing the penetration of R.M.'s sexual organ with his sexual organ. In count two, he was charged with intentionally and knowingly causing R.M's sexual organ to contact his sexual organ. In count three, he was charged with causing R.M.'s anus to contact his sexual organ. In counts four and five, he was charged with touching R.M's genitals and anus with the intent to arouse and gratify his sexual desire. In counts six and seven, he was charged with exposing R.M.'s genitals and anus with the intent to arouse and gratify his sexual desire. In count eight, he was charged with exposing his

---

[3] Later, after Martinez-Olivares had been arrested, Detective Gaslin took a "buckle swab" of his saliva to use as a known sample of his DNA.

3

genitals to R.M. with the intent to arouse and gratify his sexual desire. Martinez-Olivares pled not guilty.

At trial, in addition to Maria and Marciano, who testified to the events of July 24,[4] the prosecution called as witnesses Officer Savage, Officer Gutierrez, Detective Gaslin, Mezei, the sexual assault nurse examiner ("SANE") who examined R.M., and the forensic serologist and DNA lab supervisor who performed serology and DNA testing.

Sexual Assault Nurse Examiner Kim Sanchez testified that she performed a SANE examination on R.M. at Brackenridge Hospital shortly before 1:00 a.m. on July 25. Sanchez testified that R.M. was quiet and withdrawn. R.M. did not have any marks, bruises, or scrapes. Sanchez noticed "what appeared to be light blood stains" on the "bottom area of her pants." Sanchez testified that during her examination of R.M.'s genital area: "I found a sort of a—a tear between her vaginal area and her rectum. There is a small portion of skin, and its very tight, and I saw a .25—or I saw a .25 centimeter what appeared to be a laceration. It was a laceration." Sanchez testified that the laceration was still bleeding. Sanchez stated that it was consistent with penetration, but acknowledged that it could have been made by some other activity resulting in "enough force to tear the skin." Sanchez swabbed R.M.'s rectum, vaginal area, mouth, and fingernails. Sanchez also swabbed some "debris" that she found in R.M's "peri area" using a black light. Sanchez testified that the medical definition of "debris" is "something foreign is not—that's not there—that we would normally not see," and that the debris she found in R.M's peri area "luminesced" and "looked white"

---

[4] Maria also testified that the next day while going to the bathroom, R.M. told Maria that "her private part was hurting because Sylviano hurt her."

4

under the black light. Sanchez testified that R.M. initially said nothing, but later "stated that a Sylvanio [sic] Martinez was the—was the person that hurt her."[5] Sanchez stated that it surprised her that R.M. used Martinez-Olivares's full name because "[t]hat's not normal."

Austin Police Department forensic serologist Claire McKenna testified that the swab of R.M.'s vagina tested negative for the presence of semen, but that the presumptive test for the presence of blood was positive.[6] The swab of the debris found in R.M.'s peri area tested negative for the presence of semen. Martinez-Olivares's penile swab tested negative for the presence of semen, but a presumptive test for the presence of blood was positive. McKenna testified that semen was detected on Martinez-Olivares's pants,[7] and that a presumptive test for the presence of blood was also positive on the pants.

Cassie Carradine, a supervisor at the Austin Police Department's DNA lab, testified that she performed DNA analysis on R.M.'s vaginal swab, the swab of the debris found in R.M.'s peri area, Martinez-Olivares's penile swab, and a stain from Martinez-Olivares's pants, as well as reference samples from both R.M. and Martinez-Olivares. Carradine testified that DNA from the

---

[5] Detective Gaslin testified that although she did not remember with certainty, she thought that when R.M. was later interviewed at the Center for Child Protection, she was unable to verbalize the events of July 24.

[6] McKenna testified that the presumptive test means that something is "probably blood—or presumably blood." She explained that her lab "doesn't confirm for the presence of blood" because "it tends to deplete a lot of our sample."

[7] McKenna explained that she could definitively confirm the presence of semen because after the stain tested positive for the presumption of semen, she looked at the stain under a microscope and "could actually see sperm cells on that slide."

penile swab and the pants stain was consistent with Martinez-Olivares's DNA.[8] Carradine testified that DNA found on the swab of the debris in R.M.'s peri area was consistent with a mixture of the DNA of R.M. and Martinez-Olivares. She testified that "the probability of selecting an unrelated person at random who could be a contributor to that mixture is approximately 1 in 54.88 million for Caucasians, 1 in 182.9 million for Blacks, and 1 in 1.596 million for Hispanics." Carradine also testified that R.M. "is contributing a little bit more DNA than the defendant. However, it's fairly close. It's probably more of a—it's not a 50/50. It's probably more of like a, you know, 60/40 kind of ratio with the victim contributing just a little bit more DNA." Carradine was unable to tell the source of the DNA contributed by Martinez-Olivares, but testified that it didn't appear to be external cells "just from flaking off" because there was more of Martinez-Olivares's DNA than would be expected from that. When asked whether sweat might be the source, she said, "[s]weat is not a great source of DNA, so I would typically not expect to see that level of DNA from just sweat either." Carradine testified in response to a hypothetical question that the material could have come from Martinez-Olivares using his saliva to moisten his penis before making contact with R.M.

After the State presented its case, the defense rested. Martinez-Olivares did not testify. The jury acquitted Martinez-Olivares of aggravated sexual assault as set out in counts one and two of the indictment and convicted him of indecency with a child by contact as alleged in count four.[9] The jury sentenced him to twenty years' confinement and a $10,000 fine. On appeal,

---

[8] Carradine testified that she did not assign a statistical analysis or probability to the penile swab or pants stain because "it's an individual's own DNA on their own body, so that's something that's—that we really would not consider to [sic] probative."

[9] The prosecution waived counts three, five, and seven.

Martinez-Olivares contends that the evidence is legally insufficient to sustain his conviction and that the prosecutor's comment on his failure to testify violated his constitutional rights.

**DISCUSSION**

In his first issue, Martinez-Olivares challenges the legal sufficiency of the evidence to support his conviction for indecency with a child by contact. In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Id.*

With respect to count four of the indictment, the State was required to prove beyond a reasonable doubt that Martinez-Olivares, with the intent to arouse or gratify his own sexual desire, intentionally and knowingly engaged in sexual contact with R.M, a child younger than seventeen years and not his spouse,[10] by touching her genitals. *See* Tex. Penal Code Ann. § 21.11(a). "Sexual contact" is defined as "any touching by a person . . . of the anus, breast, or any part of the

_____

[10] Section 21.11(a) was amended in 2009 to remove the requirement that the actor *was not* the spouse of the child at the time of the offense from the cause of action and instead make the fact that the actor *was* the spouse of the child at the time of the offense an affirmative defense. *See* Act of May 18, 2009, 81st Leg., R.S., ch. 260, § 1, 2009 Tex. Sess. Law Serv. 709, 709 (Vernon). The statute was otherwise unchanged. The change in law applies only to an offense committed on or after September 1, 2009, and thus does not apply in this case.

7

genitals of a child." *Id*. § 21.11(c)(1). Martinez-Olivares argues that there is legally insufficient evidence to support indecency with a child by contact as alleged in the indictment. He contends that the State did not prove that he touched R.M.'s genitals because R.M. could not describe how the offense occurred, no definition of "genitals" was requested or given, and the only evidence of contact with R.M. was his DNA in the debris found in R.M's peri area.

Although three-year-old R.M. did not testify, the jury could have reasonably concluded that Martinez-Olivares touched her genitals as alleged in count four of the indictment. The State presented evidence that R.M. told SANE nurse Sanchez that "Sylvanio [sic] Martinez was the—was the person that hurt her," and that she told Maria that "her private part was hurting because Sylviano hurt her." In addition, the State presented, among other evidence: Maria's testimony that she saw Martinez-Olivero, naked, holding R.M., naked from the waist down, between his legs and against his body; Sanchez's testimony regarding the laceration; and Carradine's testimony that a mixture of R.M.'s and Martinez-Olivares's DNA, in a 60/40 ratio, was found in the area around R.M.'s vagina.[11] From this evidence, the jury could have reasonably drawn the inference that Martinez-Olivares touched R.M.'s genitals.

---

[11] Martinez-Olivares makes much of the fact that the debris in which his DNA was found was swabbed from R.M.'s peri area as opposed to her vagina. Section 21.11 of the penal code defines "sexual contact" as touching "*any part* of the genitals of a child." Tex. Penal Code § 21.11(c)(1) (emphasis added). We need not address whether the definition of "genitals" includes the peri area. Even if "any part of the genitals" does not include the peri area, the jury could have reasonably inferred that Martinez-Olivares made sexual contact with R.M.'s genitals from the debris containing his DNA being found in R.M.'s peri area or from any of the other evidence presented by the State.

The jury is in the best position to evaluate the credibility of the witnesses and the evidence, and we must afford due deference to its determination. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Viewed under the appropriate standard, we conclude that the evidence is legally sufficient to support Martinez-Olivares's conviction for indecency with a child. We overrule Martinez-Olivares's first issue.

In his second issue, Martinez-Olivares contends that the prosecutor violated his constitutional rights by implicitly commenting on his failure to testify in her closing argument. The portion of the prosecutor's argument that Martinez-Olivares complains of is as follows:

> Then we get to an element of what was in the defendant's state of mind. Did he intentionally and knowingly commit this act? The Judge read to you the definition of intentional and knowingly, and you'll find it when you get back there on page 3 of your charge. Essentially there's—you—to intend an act it's your conscious objective to engage in that act.
>
> And with a murder case or burglary of a habitation case, you may have an opportunity to question someone's intent. Did they mean to shoot that person? Did they intend to kill them? Did they break into that house to steal?
>
> But this kind of act there's only one state of mind. You have to intend that act. There's no other reason for getting on a knee, naked, with a little girl in front of you. There's just no other reason. So clearly the intentional and knowingly element should be met here.

Martinez-Olivares did not object to this comment at trial.

A prosecutor cannot comment on a defendant's failure to testify because such a comment violates the privilege against self-incrimination and the freedom from compulsion to testify contained in the Fifth Amendment of the United States Constitution and Article 1, section 10, of the Texas Constitution. *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001). To

9

determine whether a prosecutor's comment constituted an impermissible reference to a defendant's failure to testify, we must decide whether the language used was manifestly intended or was of such a character that the jury naturally and necessarily would have considered it to be a comment on the defendant's failure to testify. *Bustamante*, 48 SW.3d at 765; *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex. Crim. App. 1999). The language complained of must be viewed from the jury's standpoint, and the implication that the comment referred to the defendant's failure to testify must be clear. *Bustamante*, 48 S.W.3d at 765; *Swallow v. State*, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992). A mere indirect or implied allusion to the defendant's failure to testify does not violate the defendant's right to remain silent. *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); *Patrick v. State*, 906 S.W.2d 481, 490-91 (Tex. Crim. App. 1995).

In order to obtain a conviction for aggravated sexual assault under count one, two, or three of the indictment, the State was required to prove beyond a reasonable doubt that Martinez-Olivares acted intentionally and knowingly. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B). The comment Martinez-Olivares complains of was part of the prosecutor's argument that the State had satisfied its burden of proof as to each of the elements of aggravated sexual assault. The prosecutor was comparing the intent element of aggravated sexual assault with the intent elements of murder and burglary. She argued that the State had met its burden of proof on intent because unlike murder or burglary, in which the intent element is sometimes difficult to prove, here, evidence that Martinez-Olivares was caught in the act was sufficient to prove his intent. *See Turner v. State*, 600 S.W.2d 927, 929 (Tex. Crim. App. 1980) (recognizing that knowledge and intent can be inferred from conduct of the accused and from circumstances surrounding the acts in which he engaged). The

10

statement that Martinez-Olivares complains of is certainly not a direct comment on his failure to testify, and, in fact, it is difficult to discern even an implicit reference to his failure to testify. This statement is not of such a character that the jury naturally and necessarily would have considered it to be a comment on his failure to testify. *See Fuentes*, 991 S.W.2d at 275.[12] Furthermore, because Martinez-Olivares did not object at trial to the prosecutor's closing argument, nothing has been preserved for review unless the comment was so prejudicial that no instruction could have cured the

---

[12] In addition, both the prosecution, defense counsel, and the judge repeatedly told the jury that they could not hold Martinez-Olivares's decision not to testify against him. In voir dire, the prosecutor explained:

> Let's talk about the defendant's right to not take the stand, and it comes from the fifth amendment. . . . I can't call a defendant . . . to the stand as a state representative. I can't force him to testify. It's an absolute right that he has, and he makes that decision with his lawyer. Okay.

> But the jury who's seated over here has to say that they can give him that constitutional right. Do we want to know what the defendant says? Sure. Right. We want to have him testify? Sure. Right. We want to hear both sides those who are parents, what do you do? You ask both sides, right?

> That's not what happens in these kinds of cases though. Okay. So the 12 people that we pick have to be able to tell us that I'm going to let Mr. Martinez and his lawyer make that decision, and I am not going to hold that decision against him. Okay. If he chooses not to testify, I'm not going to force him just like no one else can force him. Okay. And I'm not going to let that play a part in my deliberation. Okay.

> You can wonder about it. Okay. Think about it. But you can't talk to your other jurors about it. You can't deliberate about it, and you cannot hold that against him. You cannot base a conviction thinking well, you know, he didn't take the stand, it must mean he's guilty. Okay. That's absolutely unconstitutional in this country.

The prosecutor then asked each venireperson one by one if they would be able to allow Martinez-Olivares to make a decision on whether or not to testify and not hold that against him. The jury charge also properly instructed the jury not to consider Martinez-Olivares's failure to testify against him.

11

harm.  *Losada v. State*, 721 S.W.2d 305, 313 (Tex. Crim. App. 1986).  Even if the comment complained of could be construed as a comment on Martinez-Olivares's failure to testify, it certainly does not convey the type of extreme prejudice that could not be cured by an instruction, thus Martinez-Olivares has waived any potential error.  Consequently, we overrule Martinez-Olivares's second issue.

## CONCLUSION

Having overruled both of Martinez-Olivares's issues on appeal, we affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   November 19, 2009

Do Not Publish