# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00079-CR

**Mark David Barshaw, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 62761, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Mark David Barshaw guilty of sexual assault, and the trial court assessed his punishment at twelve years' imprisonment. We reverse the judgment of conviction and remand for a new trial because the trial court permitted an expert witness to testify that the class of persons to which the complainant belongs tends to be truthful.

## BACKGROUND

On December 18, 2007, the complaining witness, K.B., was living with her mother, Debra Berndt, in Belton. K.B. is mentally retarded and functions at approximately a ten-year-old level, although she was twenty-one years old at the time. Berndt was employed as the manager of a convenience store. She testified that it was her daily routine to leave home for work at about 5:00 a.m. She would return home at 7:30, pick up K.B., and return to the store. K.B. would then

take a bus from the store to the mental health-mental retardation center where she was employed. K.B. would return to the store by bus after work, and the two would go home together.

Appellant, who worked in the maintenance department of the convenience store company, regularly stopped by Berndt's store on his way to work. Berndt had employed appellant on several occasions to work on her home air conditioner/heater. Berndt testified that she generally kept the house unlocked, and that appellant was authorized to enter the house to do his repairs. Appellant and K.B. had met, and K.B. was sometimes alone at the house when appellant was there. Appellant had most recently been to Berndt's house to repair her heater on December 15 or 16.

Berndt testified that appellant came to the store on the morning of December 18 and asked her how her heater was working. She told him that it was working fine. Berndt said that she did not ask or authorize appellant to go to her house that morning. Later, Berndt drove home at the usual time to get K.B. As they were driving back to the store, K.B. told Berndt that appellant had surprised her that morning. Berndt testified that she asked K.B. what she meant, and K.B. replied, "Well, he woke me up." Berndt did not testify in further detail about this conversation, but she stated that after hearing what K.B. told her, she called the police.

K.B. testified that she knew appellant as the person who fixed the air conditioner. She remembered an incident (but could not remember the date) when appellant came to her room and woke her. She said that appellant took off her pajama tops and bottoms and her underpants. Then, as she laid in bed, appellant touched her breasts and legs. He also spread her legs and "touched [her] pelvis." She indicated that appellant rubbed her breasts and her "pelvis." She did not know if appellant put his fingers in her "pelvis." K.B. testified that appellant did not remove his

2

clothes, and that he helped her put her pajamas back on after touching her. K.B. recalled telling her mother what had happened and going to see a doctor.

Deborah Kleypas was the sexual assault nurse examiner who examined K.B. on the morning of December 18. Kleypas testified that as part of her exam, she had K.B. recount what had happened to her. Reading from her written report, Kleypas described K.B.'s account:

> [K.B.] told me that "He," Mark, "woke me up." I asked her, "Where were you when he woke you up?" She told me that "I was in my bed in my bedroom. He did a massage, a body massage. He touched my—these," then she pointed to her breasts on herself, "and he touched my pelvis." She then pointed to her genital area on herself. "What did he touch your pelvis with?" I asked that question. "His hand. He touched my pelvis with his fingers. He was rubbing on it." She demonstrated when she told me that he was rubbing on it, she demonstrated by putting her hands between [her] legs and making a back and forth motion. "And that he touched me on the inside of my clothes."

Kleypas testified that during her physical examination of K.B., she observed what she described in her report as an abrasion to the posterior fourchette approximately 1.75 centimeters long and 1 centimeter wide. She said that this injury was consistent with the events K.B. had described. Kleypas also testified that it was not unusual for children or even adults to describe an assault as a touching, when the evidence indicates that there was penetration. A labial swab collected by Kleypas was found to have K.B.'s blood on it. K.B.'s blood was also found on her pajamas and on a bed sheet, but not on her underpants, all of which were collected by the police after being dispatched to Berndt's residence. No one else's DNA was found on any of these items.

Pammy Porter was K.B.'s MHMR caseworker. She testified that K.B. had regularly received "exploitation training," which Porter described as "don't answer the door for strangers;

3

don't talk to strangers; when you're being touched inappropriately, you have the right to say no, just things like that." Porter testified that she had never discussed "dating relationships" or "romantic relationships" with K.B., and she indicated that K.B.'s understanding of such matters would be that of a nine or ten-year-old. Porter testified that MHMR does not engage in sex education because "parents have a real issue with us training our consumers on sex." As regards sexual activities or contact, Porter said that K.B. "may not understand exactly what is going on."

Rebecca Barthlow is an MHMR psychologist. She testified that K.B. had a nonverbal IQ of 67, which she estimated was ten points higher than K.B. would score using a standard IQ test. K.B.'s adaptive behavior test score was 51, which Barthlow believed was "much more in line with what we would think her true IQ is." Barthlow testified that K.B. is "at great difficulty and a great disadvantage compared to someone of average ability as far as understanding social concepts, understanding very basic common sense kinds of things . . . ." She believed that K.B. was "closer to the moderate range of mental retardation [as] opposed to the mild range." Barthlow confirmed Porter's testimony regarding the lack of sex education at MHMR. Asked by the prosecutor if K.B. was "capable of either appraising the nature of an act or being able to resist it," Barthlow replied, "I don't believe so."[1]

Appellant acknowledged going to Berndt's house on December 18. He testified that he had to improvise the repair he made to Berndt's heater due to the age of the unit, and that he went to Berndt's residence that morning to make sure that the repair had been effective and the heater was

---

[1] The prosecutor did not specify the type of act she was referring to, but we infer that she was inquiring into K.B.'s capacity for appraising or resisting a sexually assaultive act.

4

working properly. He said that he spoke to Berndt at the store and told her what he was going to do, but she was busy at the time and may not have heard him. Appellant testified that upon entering the house, he went straight to the laundry room where the heating unit was located. Appellant said that while working, he accidentally dropped a metal panel, which made a "pretty loud noise." Appellant testified that after checking the heater and determining that it was working properly, he was putting away his tools and preparing to leave when K.B. walked into the laundry room. K.B. was wearing a T-shirt and shorts. She told appellant that it was her birthday, and they had a brief conversation about baseball.[2] Appellant testified that as he left the house, he congratulated K.B. on her birthday and gave her a kiss on the cheek. He denied touching K.B.'s breasts or genitals. He also denied knowing that she was mentally retarded.

The evidence reflects that appellant returned to Berndt's house the next morning, December 19. Appellant testified that he did so to retrieve a tool that he left the previous day.

Appellant was indicted for entering Berndt's habitation without her effective consent and committing or attempting to commit sexual assault. *See* Tex. Penal Code Ann. § 30.02(a)(3) (West 2003) (burglary of a habitation). The trial court's jury charge also included an instruction on the lesser included offense of sexual assault. *See id*. § 22.011(a)(1)(A), (b)(4) (West Supp. 2009). The jury did not convict appellant for the alleged burglary, but it found him guilty of the lesser included offense.

---

[2] Berndt testified in rebuttal that K.B.'s birthday is December 30, and that she knows this.

5

**DISCUSSION**

In *Yount v. State*, the court of criminal appeals held that evidence rule 702 does not permit an expert to give an opinion that the complainant or a class of persons to which the complainant belongs is truthful. 872 S.W.2d 706, 712 (Tex. Crim. App. 1993); Tex. R. Evid. 702. In *Yount*, a pediatrician testified that she had interviewed and examined hundreds of children who claimed to have been sexually abused and had seen very few cases where the child was not telling the truth. 872 S.W.2d at 707-08. The court ruled that this testimony should not have been admitted because "[a]n expert who testifies that a class of persons to which the victim belongs is truthful is essentially telling the jury that they can believe the victim in the instant case as well. This is not 'expert' testimony of the kind which will assist the jury under Rule 702." *Id*. at 711.

Appellant contends that the trial court abused its discretion and violated *Yount* by permitting Barthlow to testify that mentally retarded persons, as a class, tend to be truthful. This contention is based on the following exchange between the prosecutor and Barthlow:

> Q. What about people that suffer from mental retardation in their ability to fabricate or make up elaborate stories; what do you see with that?
>
> A. Generally speaking if you're—when we're dealing with mental retardation and there's not anything going on, there's just a diagnosis of mental retardation, primarily, there's not a personality disorder or something adding to that, it's been my experience that folks with mental retardation can be painfully honest, really. I mean, it's like a little kid who looks at somebody and says in the supermarket, "You're really old," or, you know, whatever little kids do.

At this point, defense counsel objected, "You can't have somebody come in and testify to a class of people are truthful." The prosecutor responded that cross-examination had raised the issue of how

6

mentally retarded persons "adapt." She added, "We have specifically the element to prove that she's suffering from a mental disease or defect, and that as a result that she's incapable of either appraising the situation or the nature of the act [or] resisting it, and as such I think it's admissible." The court overruled the defense objection and Barthlow continued:

> Q. (By [prosecutor]) Where were we?
>
> A. I was discussing individual's mental retardation, and kind of their ability to make up things. I'm not going to say that it would never happen. I mean, anybody is capable of making up something, but it's very simplistic in nature. It would be—like I said, it would be like a lie that a child would tell, a story a child would make up. It would be very easy as an adult or a parent to kind of see through that when you're thinking of that. And, again, it's been my experience in the hundreds and hundreds of people with mental retardation that I've seen, that it's more going to be that they're painfully honest. They haven't learned the social skills and probably never will to know when you should lie or when it would be socially appropriate to not tell the truth because it might hurt someone's feelings, or things of that nature, to hold things back.

The State argues, as it did below, that expert testimony regarding the nature of mental retardation and the ability of mentally retarded persons to function at an adult level was relevant to the issue of K.B.'s ability to effectively consent to the sexually assaultive acts appellant was accused of committing. *See* Tex. Penal Code Ann. § 22.011(b)(4) (consent is not effective if actor knows that as result of mental disease or defect complainant is incapable either of appraising nature of sexually assaultive act or of resisting it). Whatever validity there may be in this argument, it does not speak to appellant's contention. Barthlow's challenged testimony—that mentally retarded persons are "painfully honest" and that any story that a mentally retarded person might "make up"

7

would be "simplistic" and easily seen through—had no relevance to K.B.'s capacity to effectively consent within the meaning of section 22.011(b)(4).

The court of criminal appeals has recognized that some witnesses—the court specifically referred to children and mentally retarded persons—are viewed by society as "impaired." *Schutz v. State*, 957 S.W.2d 52, 70 (Tex. Crim. App. 1977). When such a witness is expected to testify, expert testimony should be permitted in the offering party's case in chief concerning the ability of the class of persons suffering the "impairment" to distinguish reality from fantasy and to perceive, remember, and relate the kinds of events at issue in the case. *Id.* The court emphasized that such testimony should be limited to the "impaired" class's *ability* to accurately relate events and should not extend to the class's *tendency* to do so; the latter would violate the holding in *Yount*. *Id.* In her challenged testimony, Barthlow was not questioned about and did not discuss the ability of mentally retarded persons to accurately perceive, recall, and relate events. Instead, she testified to their tendency to be "painfully honest," even to the point of being socially inappropriate.

Barthlow's testimony that mentally retarded persons are honest to a fault and cannot fabricate elaborate stories was simply another way of testifying that mentally retarded persons are, as a class, truthful. Accordingly, this violated the holdings in *Yount* and *Schutz*. The trial court abused its discretion by overruling appellant's objection and admitting the testimony.

Having found error, we must decide if it affected appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). In assessing harm, our focus is not on whether the outcome of the trial was proper despite the error, but on the error's impact on the jury. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We will not reverse a conviction for non-constitutional error if, after

8

examining the record as a whole, we have fair assurance that the error did not influence the jury or had only a slight influence. *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001).

This was a "she said, he said" case. Although there was physical evidence that K.B. had been penetrated in some manner, there was no physical evidence linking appellant to that penetration, and the outcome ultimately turned on the jury's assessment of the relative credibility of the two principal parties' testimony.

Appellant was, on the face of it, a credible witness. He was fifty years old at the time of the trial, married, and the father of a daughter who was then seventeen years old. Appellant grew up in a military family and himself spent twenty years in the Army, receiving a Bronze Star. He earned his GED while in the Army, and he earned a college degree following his retirement. Appellant had no criminal record before his arrest in this case, and several witnesses testified to his good character. There was evidence, however, that appellant had been dismissed from his job at the convenience store chain after he approached two female employees with mistletoe following the company Christmas party. There were also some inconsistencies between appellant's trial testimony and the statements he made to the police following his arrest.

K.B. was, to repeat the court of criminal appeals' observation in *Schutz*, an "impaired" witness. There were several inconsistencies and omissions in her testimony, and she did not testify that she had been penetrated. It would be understandable for the jury to be concerned that K.B.'s account was mistaken or perhaps even a fabrication. Although neither prosecutor mentioned Barthlow's testimony during final argument, we cannot avoid the conclusion that the jury, in

9

assessing K.B.'s credibility, likely gave significant weight to the expert's opinion that mentally retarded persons are generally truthful.

A conviction must be reversed for nonconstitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002). "Grave doubt" means that the matter is so evenly balanced as to be in virtual equipoise. *Id*. In cases of grave doubt as to harmlessness, the appellant must win. *Id*. at 638. In this cause, we have grave doubt as to the error's harmlessness, which is another way of saying that we do not have a fair assurance that the error did not substantially influence the jury.

Because of our disposition of this issue, we do not address appellant's other issues on appeal. The judgment of conviction is reversed and the cause is remanded to the district court for a new trial.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Waldrop and Henson
  Dissenting Opinion by Justice Henson

Reversed and Remanded

Filed: August 31, 2010

Publish